MARY JEAN MARTIN, INDIVIDUALLY, AND DOROTHY FISCHER, BY HER GUARDIAN, MARY JEAN MARTIN, PETITIONERS *V.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

JOHN R. FISCHER, RICHARD J. FISCHER, WILBURN H. FISCHER, FRANCIS J. FISCHER, AND PATRICIA ANN NORMAN, PETITIONERS *V.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 10122–82, 10740–82.     Filed April 2, 1985.

*Jack N. Van Stone,* for the petitioners in docket No. 10122–82.
*Edward W. Johnson,* for the petitioners in docket No. 10740–82.
*Frederick W. Krieg,* for the respondent.

KORNER, *Judge*: Respondent determined deficiencies in estate tax against each of the foregoing seven petitioners in the amount of $95,088.14.[1] Respondent has conceded $81,504.12 of each such deficiency, leaving deficiency determinations in the amount of $13,584.02 in issue as to each petitioner.[2]

After concessions, the sole issue remaining for our decision is whether the seven heirs of the decedent, John A. Fischer, ceased to use qualified real property for a qualified use, so that they are liable for an additional estate tax pursuant to section 2032A(c).[3]

### FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The stipulations of facts and exhibits attached thereto are incorporated herein by this reference.

At the time their petitions were filed, petitioners John R. Fischer (John R.), Richard J. Fischer (Richard), Francis J. Fischer (Francis), and Patricia Ann Norman (Patricia) resided at Mount Vernon, Indiana; petitioner Wilburn H. Fischer (Wilburn) resided at Corpus Christi, Texas; and petitioners Mary Jean Martin (Mary) and Dorothy Fischer (Dorothy), by her guardian, Mary Jean Martin, resided at Poseyville, Indiana.

John A. Fischer (the decedent) and his wife, Florence Fischer (Florence) were citizens of the United States and resided in Posey County, Indiana, for virtually all of their lives. The decedent and Florence owned, as tenants by the entirety, certain real estate in Posey County, Indiana, consisting of a total of 209 acres, and comprised of approximately 166 acres of farm land, 23 to 26 acres of unproductive and unmanaged woodland of little value, 17 to 20 acres of woods and creeks, and a residence (hereinafter referred to, collective-

---

[1]Respondent also determined additions to tax under sec. 6651(a)(1), as to each of the petitioners herein, but has conceded this issue.

[2]Such concessions were explained by respondent as follows:

"In each statutory notice of deficiency issued to the seven petitioners herein, respondent determined the full amount of the additional estate tax, or $95,088.14. Respondent should have determined one-seventh of the full amount of the additional estate tax against each of the seven petitioners, or $13,584.02."

[3]All statutory references are to the Internal Revenue Code of 1954 as amended and in effect for the year in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure, except as otherwise stated.

ly, as the farm). At all times here pertinent, the farm produced various types of crops.

Decedent and Florence Fischer had seven children, namely: John R., Richard, Wilburn, Francis, Dorothy, Patricia, and Mary.

The principal occupation of decedent and Florence Fischer was farming, and they personally farmed the foregoing acreage until approximately 1970, when they were unable to do so as a result of advancing age and poor health. At such time, they entered into an oral sharecrop arrangement with Mary's husband, Anthony Martin (Anthony), whereby he would farm approximately 95 acres of the farm on a sharecrop basis, with one-third of the net proceeds therefrom going to the lessors and the remainder going to Anthony. In 1974, the lease was modified to include the entire farm.

At an undisclosed time prior to 1978, Patricia became the guardian of decedent and Florence Fischer. During 1977, a typewritten lease of the farm was entered into between Patricia, in her guardian capacity, and Anthony, continuing the one-third, two-thirds split between the landlords and the tenant.

On or about March 29, 1977, Florence died, and the farm passed to her husband by operation of law. On January 29, 1978, decedent died.

By the will of the decedent, which was probated, his seven children received the farm as tenants in common. John R. qualified as the personal representative of the estate of his father, and an estate administration was opened in the Posey Circuit Court in Indiana.

From January 29, 1978 until August 1979, the farm continued to be farmed on a sharecrop basis by the decedent's son-in-law, Anthony Martin, pursuant to automatic extensions of the 1977 lease.

On September 29, 1978, John R. caused to be filed with the Internal Revenue Service, a United States Estate Tax Return, Form 706, on which the estate properly elected to value the farm pursuant to section 2032A. The return was accepted as filed and a closing letter was issued by respondent on June 16, 1980. The seven qualified heirs each executed a document styled "Agreement to Remain Liable For Additional Estate

Tax For the Estate of John A. Fischer, Deceased." John R. was appointed the active agent for the qualified heirs.

As filed, the estate tax return showed a total estate tax of $11,473.02. Had the parties not elected the special-use valuation for the farm, the estate would have owed an additional $95,088.14 in estate taxes at the time the return was filed. However, the requirements of section 2032A were complied with, and the estate was entitled to, and properly received, a special valuation for the farm under section 2032A.

By 1978, Dorothy had become mentally incompetent, and on April 13, 1978, Mary was appointed as her guardian, and continued in that capacity at all times here pertinent.

Subsequent to filing the estate tax return, John R. determined that Anthony should not continue farming the property. Accordingly, on February 15, 1979, John R. caused to be sent to Anthony a notice to terminate the typewritten 1977 lease agreement. The notice of termination was to be effective on August 15, 1979, and provided that Anthony was not to thereafter plant any crops to be harvested after that date, and was to have all of his crops off of the farm prior to that date, but Anthony was permitted to remove any crops, already planted, which would not mature until after August 15, 1979.

In July or early August of 1979, John R. advertised for bids to lease the farm for a 1-year period on a pure cash rental basis. Several sealed bids were submitted, each of which was based on a fixed dollar amount. When the sealed bids were opened in August 1979, the highest bid was submitted by Droege Farms, which submitted a cash rental bid of $21,060. On August 17, 1979, a cash lease of the farm was entered into by and between the personal representative and Edmund Droege, acting for Droege Farms as lessee. Edmund Droege was a third party, who was not related to the decedent or Florence. The contract provided for payment of 10 percent of the total rent on or before September 1 of the year in which the lease was signed, with the remainder due on or before the last day of January 1981.

On August 24, 1979, John R., as personal representative, petitioned the Posey Circuit Court to approve the lease to Droege Farms. At least in part as a result of concern over losing the advantages of the special use valuation under section 2032A, two of the heirs, Mary in her individual

capacity, and Mary as guardian of Dorothy, filed written objections to the lease. Over such objections, on October 16, 1979, the Posey Circuit Court approved the lease.

The rental specified in the cash lease, $21,060, was based upon $117 per acre multiplied by 180 tillable acres. The initial 10-percent payment specified in the lease, or $2,106, was paid in the Spring of 1980, after which time it was determined that there were only 165.9 tillable acres. Accordingly, the final lease payment was adjusted to $17,304.30, computed as the product of 165.9 acres and $117, less the $2,106 initial payment. The rental was not based upon the level of crop production from the farm.

On September 12, 1979, Mary, acting individually and as guardian for Dorothy, filed with the Posey Circuit Court a petition for partition of the farm.

In or about October of 1979, Anthony, the prior lessee, was permitted to and did enter the farm to remove his crops. Between August 17, 1979, and October of 1979, while Anthony's crops were still in the field, and prior to approval of the cash lease by the Posey Circuit Court, Droege Farms did not plant. In November of 1979, however, Droege Farms planted winter wheat, and it likewise was permitted to and did remove its crops in or about October of 1980. Droege Farms thereafter sold the crop, and made the final rental payment under the August 17, 1979, cash lease on December 29, 1980. On August 17, 1980, the 1-year cash lease to Droege Farms ended.

During the cash lease of the farm, the farming operation was conducted by Droege Farms, which used its own chisel plow, moldboard plow, grader blade, disc, culti-mulchers, planters, drill, tractor, and combine. The estate owned no farm equipment.

During the cash lease term, Richard and John R. participated in maintenance and operation of the farm by performing a number of duties, including clearing approximately one-half mile of fence rows, repairing field tile and a washed-out culvert, and filling so-called sinkholes on the farm. In addition, John R. regularly conferred with Edmund Droege, providing advice to the lessee concerning the location for planting crops, plowing and fertilizing methods, crop rotation, seed selection,

disking, control of Johnson grass and other weeds, and rototilling.

At the termination of the 1-year cash lease, a sharecrop lease was executed on August 19, 1980, by and between John R., acting as agent for himself, Richard, Wilburn, Francis, and Patricia, and Edmund Droege, acting for Droege Farms, for the lease of a portion of the farm consisting of approximately 143 acres. Droege Farms has continued to operate this portion of the farm on this basis. At or about the same time, Mary and her husband, Anthony, began farming the remaining portion of the farm, or some 65 acres, which constituted a two-sevenths share of the entire farm.

On October 16, 1980, some 4 months after issuance of his closing letter, respondent first became aware of the August 19, 1979, cash lease between the personal representative and Droege Farms.

The estate of the decedent was closed on or about November 3, 1980, and the entire farm was thereafter transferred to all seven heirs as tenants in common.

On May 11, 1982, the Posey Circuit Court approved an agreement of the parties to partition the farm. Pursuant to the agreement, 142.5 acres were set off as the sole property of John R., Richard, Wilburn, Francis, and Patricia as tenants in common, and 65.3 acres were set off as the sole property of Mary, individually, and Dorothy, by Mary as guardian.

## OPINION

The sole issue presented for our decision is whether the seven heirs of the decedent, all of whom are petitioners herein, ceased, by virtue of cash leasing the farm to Droege Farms, to use qualified property for a qualified use, calling for imposition of the additional estate tax (also called a recapture tax) under section 2032A(c). Since the applicability of the recapture tax is an issue of first impression with this Court, we begin with a brief review of the history and purposes of section 2032A.

Section 2032A was added by the Tax Reform Act of 1976, Pub. L. 94–455, 90 Stat. 1520. Under prior law, the value of property included in the decedent's gross estate was the fair market value of the property interest at the date of death (or the alternate valuation date). Secs. 2031, 2032. Such fair

market value was determined with regard to the "highest and best use" to which the property could be put. Later, however, Congress came to feel that this "highest and best use" valuation was inappropriate in the case of land actually used for farming or certain other purposes both before and after the decedent's death, for the following reasons:

Valuation on the basis of highest and best use rather than actual use may result in the imposition of substantially higher estate taxes. In some cases, the greater estate tax burden makes continuation of farming etc., activities not feasible because the income from these activities is insufficient to service extended tax payments on loans obtained to pay the tax. Thus, the heirs may be forced to sell the land for development purposes. [S. Rept. 94–938 (1976), 1976–3 C.B. (Vol. 3) 643, 657.]

At the same time, it was realized that it would be a windfall to the beneficiaries to provide the foregoing relief in instances where the beneficiaries did not continue to use the property for a reasonable period as the decedent did before death.

In response to these concerns, Congress enacted section 2032A in 1976, providing for an elective procedure whereby the executor could value certain qualified real property included in the gross estate on the basis of the value of the property in its current use, rather than its highest and best use. It was intended that this benefit would apply to family farms or businesses. See *Estate of Sherrod v. Commissioner*, 82 T.C. 523, 531 (1984), on appeal (11th Cir., Oct. 19, 1984); H. Rept. 94–1380 (1976), 1976–3 C.B. (Vol. 3) 735, 755–756.

To qualify for the special use valuation, the following conditions must be met: (1) The decedent at the time of his death must have been a citizen or resident of the United States; (2) the property for which the special use value is sought must be located within the United States; (3) the property must pass to a member of the decedent's family who qualifies under section 2032A; (4) the property must represent at least 50 percent of the adjusted value of the gross estate and must have been used at the decedent's death for a qualified use; and (5) 25 percent or more of the adjusted value of the gross estate must consist of such property which during 5 of the 8 years preceding the decedent's death was used for a qualified use by the decedent or a member of his family, and there must have been material participation by the decedent or the member of his family in the operation of the farm or

other business. See *Estate of Sherrod v. Commissioner, supra* at 532.

The parties herein are in agreement that the estate of the decedent qualified for and properly elected the special use valuation under section 2032A. The instant dispute arises, however, with respect to the post-death use of the farm during administration of the estate, as a result of which, respondent urges, the qualification of the estate for the special-use valuation ceased.

In accordance with the foregoing congressional intent to avoid windfall benefits for beneficiaries who ceased to continue using property as the decedent did for a reasonable post-death period, section 2032A(c)(1) provides for imposition of an additional estate tax, as follows:

(1) IMPOSITION OF ADDITIONAL ESTATE TAX.—If, within 15 years[4] after the decedent's death and before the death of the qualified heir—
(A) the qualified heir disposes of any interest in qualified real property (other than by a disposition to a member of his family), *or*
(B) *the qualified heir ceases to use for the qualified use the qualified real property which was acquired (or passed) from the decedent, then there is hereby imposed an additional estate tax.*
[Emphasis added.]

Pursuant to section 2032A(b)(2), the "qualified use" referred to in the foregoing section 2032A(c)(1)(B) is defined by reference to the same definition which applies to the pre-death qualified use requirement for initial qualification, as follows:

(2) QUALIFIED USE.—For purposes of this section, the term "qualified use" means the devotion of the property to any of the following:
(A) use as a farm for farming purposes, or
(B) use in a trade or business other than the trade or business of farming.

The legislative history of section 2032A makes it clear that for either of the foregoing uses to qualify, it must constitute a trade or business, and not a merely passive rental use. As noted by the House Ways and Means Committee in its report explaining the foregoing provision:

---

[4]For the estates of decedents dying after Dec. 31, 1981, this period was amended to the present 10 years. Pub. L. 97–34, sec. 421(c)(1)(A), 95 Stat. 172, 307.

In the case of either of these qualifying uses [use as a farm for farming purposes or use in a trade or business other than farming], your committee intends that *there must be a trade or business use. The mere passive rental of property will not qualify.* However, where a related party leases the property and conducts farming or other business activities on the property, the real property may qualify for special use valuation. * * * However, if the property is used in a trade or business in which neither the decedent nor a member of his family materially participates, the property would not qualify. [H. Rept. 94–1380 (1976), 1976–3 C.B. (Vol. 3) 735, 757; emphasis added.]

As noted *supra*, additional estate tax is imposed under section 2032A(c)(1)(B), where there is a cessation of the aforedescribed "qualified use" of qualified property by the qualified heir. The phrase "cessation of qualified use" is defined in section 2032A(c)(7),[5] as follows:

(7) CESSATION OF QUALIFIED USE.—For purposes of paragraph 1(B), real property shall cease to be used for the qualified use if—

(A) *such property ceases to be used for the qualified use set forth in subparagraph (A) or (B) of subsection (b)(2) under which the property qualified under subsection (b); or*

(B) during any period of 8 years ending after the date of the decedent's death and before the date of the death of the qualified heir, there had been periods aggregating 3 years or more during which—

(i) in the case of periods during which the property was held by the decedent, there was no material participation by the decedent or any member of his family in the operation of the farm or other business, and

(ii) in the case of periods during which the property was held by any qualified heir, there was no material participation by such qualified heir or any member of his family in the operation of the farm or other business.

[Emphasis added.]

Imposition of the additional estate tax after the decedent's death can therefore be triggered by any one, inter alia, of the following events:

(a) A failure to continue the *same qualified use* of the property, which was the basis of its original qualification, section 2032A(c)(7)(A);

(b) A failure by a *qualified heir* to continue such use, section 2032A(c)(1)(B); or

(c) A failure of *material participation* by a qualified heir in continuing the same qualified use, section 2032A(c)(7)(B).

---

[5] A similar provision is now contained in sec. 2032A(c)(6).

In the instant case, respondent has not raised a material participation objection under section 2032A(c)(7)(B). Rather, respondent contends that the farm ceased to be used by the qualified heirs for the farm use for which it initially qualified, because of the 1-year cash lease entered into with Droege Farms.

As we have found, the farm qualified under section 2032A at the time of the decedent's death, when it was being farmed on a sharecrop basis by the decedent's son-in-law. After the death of the decedent, however, John R., acting as personal representative of his father's estate, notified Anthony to terminate his sharecrop leasing of the farm effective on August 15, 1979. During the summer of 1979, John R. solicited bids to lease the farm for a 1-year period on a pure cash rental rather than a sharecrop basis. The lease went to the highest bidder, Edmund Droege, acting for Droege Farms, and an all-cash lease was executed on August 17, 1979, and then approved by the Posey Circuit Court, over the opposition of two of the heirs of the decedent, on October 16, 1979. The lease called for a flat rental of $21,060 for the year, computed as the product of a $117 rental per acre, and the 180 tillable acres on the farm, and such rental was to be due and payable without regard to any production from the farm.

In an opinion of this Court which was filed after the trial in the instant case, *Estate of Abell v. Commissioner*, 83 T.C. 696 (1984), we held that the decedent's lease of a cattle ranch to an unrelated party for a pure cash rental, for many years ending with her death, failed to constitute a qualified use by the decedent under section 2032A, since under the lease, the decedent had no "equity interest" in the trade or business being operated on her property by the lessee. As was the case with several of the heirs herein, the decedent in *Abell* continued to participate in the management, supervision, and operation of the ranch, but such activities failed to overcome her relinquishment of an equity interest in the cattle business (i.e., a qualified use) during the term of and as a result of her cash lease of the property.

Since, as noted *supra*, a cessation of qualification for the special treatment of section 2032A will occur when property ceases to be used by the qualified heir for the use with respect to which it first qualified, we believe that our holding in *Estate*

*of Abell*, which related to the initial qualification of property based upon its pre-death use by the decedent, controls the instant case, which relates to continued qualification based upon post-death use by the heirs. In accordance with *Estate of Abell*, the rental of the farm to Droege Farms for a pure cash rental during portions of 1979 and 1980, clearly constituted a cessation of the same qualified use by the qualified heirs, calling for imposition of the recapture tax under section 2032A(c)(1)(B).[6]

In support of their contention that no such cessation occurred, petitioners rely upon two cases, both of which address the qualified use requirement of section 2032A in the context of the pre-death use test for the initial special use qualification of farm or business property under subsection (b)(1).

In the first such case, *Estate of Sherrod v. Commissioner*, *supra*, this Court held qualified for special use valuation under section 2032A, a total of 1,478 acres of land, of which, at the time of the decedent's death, 1,108 acres were in timber, and the remaining 370 acres were in row crops or pasture, and were cash-leased to third parties. Essential to our decision in that case were the facts that the cash-leased acreage constituted only 25 percent of the total acreage, and that the management of the leased acreage had for many years been "an integral part of, and inseparable from," the management of the timber acreage. Furthermore, we found that the practice of leasing the 370 acres was "consistent with good land management," since the land consisted of two parcels, each of which was too small to profitably use for row crops and which were too distant to work as a unit, and provided cash with which to pay such expenses as taxes for the entire property. On these facts, we concluded that the management of the 370 leased acres constituted part of the "active farm business" in which the decedent (or his son) was involved on the remaining 1,108 acres.

In the instant case, by contrast, it was initially determined that Droege Farms would lease 180 tillable acres, or some 86

---

[6] We need not decide whether the qualified heirs, through John R. as personal representative, were engaged in a trade or business, and therefore in a "qualified use" under sec. 2032A(b)(2)(B), when they leased the farm to Droege Farms. Even if they were, it was not the trade or business of farming, which was the basis of the initial qualification. Sec. 2032A(c)(7).

percent of the total acreage. While the estimate of tillable acreage was later reduced to 165.9 acres (with a commensurate reduction in the rent), this still constituted some 79 percent of the total acreage. Furthermore, unlike *Estate of Sherrod*, there is no evidence to show that any active farming business was conducted on the remaining acreage, which by stipulated agreement of the parties, consisted essentially of 23 to 26 acres of "unproductive and unmanaged woodland of little value" and 17 to 20 acres of woods and creeks and a residence.

In sum, *Estate of Sherrod* holds that property may be put to a qualified use under section 2032A, notwithstanding that a portion of such property is leased for a flat cash sum, but only where the leased portion is a relatively small part of the entire property and where the requisite nexus can be shown between the leased portion and the conduct of the active business of farming on the remainder of the property.[7] During the term of the cash lease to Droege Farms, however, petitioners have failed to demonstrate the presence of either of these essential conditions.[8]

The second case relied upon by petitioners is *Schuneman v. United States*, an unreported case (C.D. Ill. 1984, 84–1 USTC par. 13,561), supplementing 570 F. Supp. 1327 (C.D. Ill. 1983). In that case, the District Court for the Central District of Illinois, on facts similar to those in the instant case, examined the legislative history of section 2032A, holding that the qualified use provision required the decedent (or, under the 1981 amendments, a member of her family) to be "using" the property at the time of her death, and that a mere passive rental for a cash sum would not qualify. 570 F. Supp. at 1330. In rejecting the plaintiff's position that it was the material participation requirement that was intended to involve the

---

[7] In support of this interpretation of *Estate of Sherrod v. Commissioner*, 82 T.C. 523 (1984), on appeal (11th Cir., Oct. 19, 1984), see *Estate of Trueman v. United States*, 6 Cl. Ct. 380 (1984), which was decided after filing of the initial briefs herein.

[8] Petitioners make much of our findings in *Estate of Sherrod v. Commissioner, supra*, that the decedent and later his son negotiated annual rental agreements, periodically inspected the timberland and contacted tenants and adjoining landowners, and paid local taxes on the acreage there in issue. We cannot agree with petitioners, however, that such activities formed the basis for our conclusion in that case that the use of the property was a *qualified use* under sec. 2032A(b)(2). Rather, the cited findings related to our further conclusion that there was "material participation," within the meaning of sec. 2032A(b)(1)(C), a separate requirement under sec. 2032A (see *Estate of Coon v. Commissioner*, 81 T.C. 602, 606 (1983)), and one as to which there is no dispute in the instant case. See *Estate of Sherrod v. Commissioner, supra* at 534–535. See also *Estate of Abell v. Commissioner*, 83 T.C. 696 (1984).

decedent in the active operation of the farm or other business, and not the qualified use requirement, the District Court noted that "While both requirements insure that the decedent (or a member of his family in the case of material participation) is connected with the property, *they are separate requirements*." 570 F. Supp. at 1330. (Emphasis added.)

After reaching the foregoing conclusions, with which we are in full accord, the District Court proceeded in that case to note that the decedent would be considered as using the property at her death if the lease of the property at that time was substantially based on production, *or* if the decedent materially participated in operation of the farm. 570 F. Supp. at 1332. We concur, of course, that a pre-death use will be found to be qualified under section 2032A(b)(2), where the decedent leased the property for a rental which was substantially dependent upon production, such as a sharecrop lease. However, in suggesting that a qualified use may be found solely by virtue of the decedent's material participation in operation of the farm property, we believe that the District Court contradicted its own correct observation that qualified use and material participation are two separate and distinct requirements under section 2032A(b). See *Estate of Abell v. Commissioner, supra*; *Estate of Trueman v. United States, supra*.

Petitioners raise a number of arguments in opposition to the conclusion that the August 1979 lease to Droege Farms constituted an event calling for the imposition of additional estate tax under section 2032A(c)(1)(B). Many of petitioners' arguments are directed toward convincing us that section 20.2032A–3, Estate Tax Regs., which was promulgated on July 28, 1980, T.D. 7710, 1980–2 C.B. 254, and which relates to the material participation requirements for special use valuation, is inapplicable to the instant case. Specifically, the portion of the regulation objected to by petitioners provides that "All specially valued property must be used in a trade or business. * * * The mere passive rental of property to a party other than a member of the decedent's family will not qualify." Sec. 20.2032A–3(b)(1), Estate Tax Regs.

We note that in considering the issue of the qualified use of property passed by a decedent who died in 1979, in *Estate of Abell v. Commissioner, supra*, this Court cited the foregoing regulation with approval. We believe that a reading of *Estate*

*of Abell* makes it clear that the decision therein was grounded upon a careful analysis of the language and legislative history of section 2032A, and not upon the regulation. Since our determination of the instant case is similarly premised upon the language and legislative history of section 2032A, and is made without regard to the cited regulation, we need not consider further petitioners' arguments with respect thereto.

Petitioners next make two arguments relating to Indiana State law. First, petitioners contend that they should not be "penalized" under section 2032A for activities allegedly undertaken pursuant to their purported responsibility under Indiana law to use the property in the estate to obtain the highest income therefrom. In support of this position, however, petitioners point solely to two sections of Indiana law, Indiana Code Annotated sections 29–1–16–1 and 29–1–17–7 (Burns 1972), neither of which provides that property in an estate must be used as was done here. Rather, the first section cited relates to the liability of the personal representative for certain losses suffered by the estate as a result of his negligence or nonfeasance in the performance of his responsibilities. Petitioners appear to argue that John R. could have been held liable under this section if he had *not* entered into the lease with Droege Farms, the premise being that only thus could he derive the maximum return for the heirs. Such an assumption is entirely unproved in this record; there is no proof that John R. could not have done just as well by continuing the existing sharecrop arrangement with Anthony or someone else, e.g., Droege Farms.

The other section of Indiana law relates to the responsibility of the personal representative to disburse, distribute, and account for certain income received by him during administration of the estate, and petitioners do not contend that there was any failure on the part of John R. to meet his responsibilities under this provision, nor that there would have been if he had not entered into the lease.

Second, petitioners point to Indiana Code Annotated section 29–1–13–1 (Burns 1972), which provides, inter alia, that the personal representative shall take possession of all of the real and personal property of the decedent, and that he "may maintain an action for the possession of real property or to determine the title to the same." Pursuant to this section,

according to petitioners, "the heirs of this * * * estate could not have ceased to use the farm in question when the heirs, [sic] never had control of the farm in the first place." The heirs, petitioners contend, only began to have use of the farm in late 1980, after the estate was closed.

We cannot concur in petitioners' contention that they did not have use of the farm until late 1980, within the meaning of section 2032A. As we have found, immediately after the death of the decedent (as before), his son-in-law, Anthony, continued to operate the farm under the 1977 lease, as extended. Since, by stipulated agreement of the parties, the estate was "entitled to, and did receive, a special valuation for the entire farm under Section 2032A," [Stip. 14] it is clear that Anthony was a qualified heir (section 2032A(e)(1) and (2)) using qualified property for a qualified use under that section.

The sole provision which might have excused petitioners' failure to use the farm for a post-death qualified use during all or a portion of the period of administration of the decedent's estate, is section 2032A(c)(7)(A), which was added by section 421(c)(2)(A) of the Economic Recovery Tax Act of 1981, Pub. L. 97–34, 95 Stat. 172, and which establishes a 2-year grace period immediately following the date of the decedent's death, as follows:

(A) No TAX IF USE BEGINS WITHIN 2 YEARS.—If the date on which the qualified heir begins to use the qualified real property (hereinafter in this subparagraph referred to as the commencement date) is before the date 2 years after the decedent's death—
    (i) no tax shall be imposed under paragraph (1) by reason of the failure by the qualified heir to so use such property before the commencement date, and
    (ii) the 10-year period[9] under paragraph (1) shall be extended by the period after the decedent's death and before the commencement date.

While this provision is generally retroactive to estates of decedents dying after December 31, 1976, including the estate of the decedent[10] (see Pub. L. 97–34, sec. 421(k)(5), 95 Stat. 172, 314), it does not benefit petitioners in the instant case, since Anthony, who was a qualified heir within the meaning of section 2032A(e)(1) and (2), was involved in the qualified post-

---

[9]For the year here in issue, this was a 15-year period.

[10]Petitioners make no claim under such section, apparently because of their mistaken belief that the section is not to be retroactively applied.

death use of the farm (i.e., the sharecrop lease) *immediately* after the death of the decedent. Moreover, even if Anthony's use of the farm did not constitute the beginning of the qualified use of the farm by the qualified heir within the meaning of the new section 2032A(c)(7), two years after the death of the decedent, or in January of 1980, the farm was still under cash lease to Droege Farms, vitiating the precondition for application of the relief provided for in section 2032A(c)(7)(A) (i.e., that the use by a qualified heir begin within 2 years after the decedent's death).

It is petitioners' next contention that the farm was cash leased for such a short period of time, relative to the time that it was farmed on a sharecrop basis, that no real "cessation of qualified use" occurred. As conceded by petitioners, however, neither the Code nor the regulations allow for any de minimis exception to the qualified use requirement of section 2032A, and we see no basis for reading such an exception into that provision.

Finally, petitioners contend that the heirs of the decedent "did materially participate and contribute to the maintenance and operation of the farm during the term of the cash lease." Even assuming that the activities of some or all of the heirs constituted material participation during the period of the cash lease to Droege Farms, however, a cessation of qualified use occurs under section 2032A(c)(7) upon *either* a failure of material participation for a specified duration, *or* a failure of qualified use by the qualified heirs. In this case, such a failure of qualified use by the qualified heirs is clearly shown, is not cured by any "material participation" by petitioners (*Estate of Abell v. Commissioner, supra*), and must give rise to the imposition of additional estate tax under section 2032A(c)(1)(B).

To reflect the foregoing,

*Decisions will be entered under Rule 155.*