ESTATE OF SELMA N. DONAHOE, DECEASED, MARY L. BROCKMAN, ADMINISTRATOR, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Estate of Donahoe v. Commissioner
Docket 28311-85.
United States Tax Court
T.C. Memo 1988-453; 1988 Tax Ct. Memo LEXIS 477; 56 T.C.M. (CCH) 271; T.C.M. (RIA) 88453; September 21, 1988. John W. Hynds and Diane L. Yohnka, for the petitioner. Judith M. Picken, James C. Lanning and David D. Baier, for the respondent. CLAPP
MEMORANDUM FINDINGS OF FACT AND OPINION CLAPP, Judge: Respondent determined a deficiency in decedent's Federal estate tax in the amount of $ 18,287.40. After concessions, the sole issue for decision is whether a 100-acre tract of decedent's farmland qualifies for special use valuation under section 2032A. *478 [1]
FINDINGS OF FACT Some of the facts were stipulated and are so found. The stipulation of facts and exhibits attached thereto are incorporated by this reference. Selma N. Donahoe (decedent), a citizen of the United States and resident of Illinois, died intestate on November 6, 1981. Mary L. Brockman (Brockman), Selma's daughter and sole heir, was appointed administrator of the estate. Brockman resided in Morris, Illinois at the time of filing the petition, and timely filed an estate tax return for the estate of decedent with the Internal Revenue Center in Kansas City, Missouri. At the time of her death, decedent owned an undivided one-half interest in four separate tracts of land totalling 443.16 acres, as decedent and Brockman each interested an undivided one-half interest in the four tracts of land totalling 443.16 acres from John Donahoe, decedent's husband and Brockman's father who died in 1968. Part of the farmland had been in the family for over 100 years and other *479 parts for 50 to 60 years. John Donahoe was engaged in farming until his death in November 1968. From 1953 through 1968, Brockman and her husband, Kenneth, were engaged in farming with decedent's husband. Brockman, her husband and their four sons now participate in a family farming operation primarily involved in the production of corn and soybeans. They use no hired help to farm their property. In addition to the 443.16 acres of land inherited from John Donahoe in 1968, decedent and Brockman each inherited an undivided one-half interest in 160 acres in Grundy County. By deeds dated December 19, 1974 and March 17, 1975, decedent deeded her interest in this 160 acres to the six children of Brockman and her husband, Kenneth. The United States Agriculture Stabilization and Conservation Service lists the total property owned by the Brockman family as a single farm. On the Federal estate tax return filed on behalf of decedent's estate, the administrator selected the special use tax valuation pursuant to section 2032A of the Internal Revenue Code, with respect to the four tracts of land totalling 443.16 acres in Grundy County, Illinois, except for a 5-acre *480 parcel containing decedent's residence. The four tracts were appraised for estate tax purposes by Lonial R. Lovellette, a professional appraiser with offices in Morris, Illinois. Based upon soil analysis, other pertinent data and comparable sales, he determined that the 443.16 acres had a current fair market value of $ 934,500 on November 6, 1981, of which he allocated $ 154,502.60 to Tract IV less the five-acre plot. He further determined that the value of Tracts I, II, and III under the special use formula of section 2032A was $ 218,692.81 on November 6, 1981, and that the special use value of Tract IV except the five-acre plot was $ 7,603.34 on that same date. After an audit, respondent disallowed the section 2032A election for the special use valuation for 100 acres of land located within Tract IV. Respondent determined that the election for the special use valuation of the remaining part of the real property was otherwise proper and timely. On the date of decedent's death, the 100 acres of land in Tract IV was being used by Brockman's family as pasture for their beef cattle operation. Prior to 1953, decedent's husband, John Donahoe, had a cattle operation on the entire *481 Tract IV. From 1953 to 1974, this tract of land was used for the production of grain and hay and was also, at times, enrolled in the U.S. Government set aside program. The set aside program pays cash to farmers who reduce their production of corn by setting aside acres when there is an overproduction of corn. A corn crib and cattle barn are located on the 5-acre plot in Tract IV which contained decedent's residence. The crib and barn are used for storage of corn and soybeans and as a shelter for cattle belonging to the Donahoes and Brockmans. Machinery for the Donahoes' farming operation was also stored on the 5-acre plot in Tract IV. Tracts I, II and III were actively farmed by the Brockmans during all relevant periods. During the years 1975 through 1979, the Brockmans continued their beef cattle operation on all but 100 acres of Tract IV. For the years 1975 through 1978, the 100 acres of pasture land was leased by oral agreement during the summer grazing period to a neighbor, James Dickison; and for 1979, the 100 acres was subleased by Dickison to another neighbor, Tom Coleman. This was done because there were not enough cattle owned by the Brockmans to utilize the pasture *482 land on all of Tract IV. Neither James Dickison nor Tom Coleman is related to decedent or the Brockmans. The rental for this property was $ 2,100 or $ 21 per acre, and was based on the taxes dues on such acreage. Decedent and Brockman each reported $ 1,050 on her Federal income tax return for each of these years. Pursuant to the lease arrangements, Kenneth Brockman, Brockman's husband, agreed to build new fences and replace old fences around this acreage to protect against damage to his property by the lessee's cattle, and James Dickison agreed to lease the 100-acre lot for a period of 5 consecutive summers. James Dickison sublet the 100-acre plot during the fifth summer to Tom Coleman. Due to the nature of cattle pasture farming, the 100-acre plot was not used by either the Brockmans or the lessees during the winter months, as there was no grass remaining after October or November. Thus, the "summer" rental was from May-June through October-November of each year. After that time, the lessees took their cattle and went elsewhere and had nothing whatsoever to do with the property. During the years 1975 through 1979, the Brockmans pastured their cattle on the balance of Tract *483 IV and utilized the cattle barn and storage barns for their family operation. Decedent lived in the residence located on Tract IV until her death in 1981. In 1975 and 1979, the Brockmans constructed new fences and repaired existing fences to separate the fields that were rented out. The Brockmans inspected, repaired and maintained all the fences, and monitored and maintained the drain tiles on all of Tract IV during this period. The Brockmans were not otherwise involved in the cattle operation of either Dickison or Coleman and did not carry those operations on their books or pay any self employment taxes in connection therewith. From 1980 to the present, the 100-acre plot was and is used by the Brockman family for its cattle operation, some corn and soybean production, and for the Government set aside program. Currently, their son, Tim, lives there and has expanded his cattle operation to include use of the 100 acres of pasture land. OPINION The issue for decision is whether the 100 acres qualify for a special use valuation under section 2032A. When the requirements of section *484 2032A are satisfied, property may be valued by capitalizing the income derived from the actual use of the property rather than adopting its fair market value based on its highest and best use. Section 20.2032A-3(a), Estate Tax Regs. Congress intended that the value of the land bear a reasonable relationship to its earning capacity, and that its speculative value should not be included in the gross estate. See H. Rept. No. 94-1380, 1976-3 C.B. (Vol. 3) 735, 755, 756. Special use valuation is an "exceptionally favorable tax treatment that the statute provides to those who come within its demanding terms." See Martin v. Commissioner,783 F.2d 81, 84 (7th Cir. 1986), affg. 84 T.C. 620 (1985). However, the statute is a relief statute and its purpose is to "encourage the continuation of family farms after the death of the farm's owners." Martin v. Commissioner,supra at 82. In this regard, each individual set of facts and circumstances must be closely examined. In order to qualify for special use valuation, five conditions must be met: 1. the decedent must have been a citizen or resident of the United States; *485 2. the property, the value of which must exceed certain percentages of decedent's gross and adjusted estate, must be located in the United States; 3. the property must pass to a qualified heir who must be a member of decedent's family; 4. the decedent or a member of decedent's family must materially participate in the operation of the farm or business in 5 of the 8 years preceding decedent's death; and 5. the property must have been used for a qualified use by the decedent or a member of the decedent's family for periods aggregating 5 years during the 8-year period proceeding decedent's death and also at the date of decedent's death.
See section 2032A; Estate of Abell v. Commissioner,83 T.C. 696, 699 (1984); Estate of Sherrod v. Commissioner,774 F.2d 1057 (11th Cir. 1985), revg. 82 T.C. 523 (1984). In this case, respondent concedes that petitioner satisfies all of the conditions for special use valuation other than the qualified use and material participation requirement. Respondent contends that the cash lease arrangement that existed in 5 of the 8 years preceding the death of decedent disqualifies the 100-acre *486 plot for a special use valuation. Petitioner, on the other hand, argues that the receipt of cash from a lease, although generally associated with passive rental of land, must be examined in light of the overall farming activities. Petitioner urges that the family farm business should not be denied coverage by section 2032A by focusing on narrow issues such as the presence of cash payments made in the context of overall farm operation, which would cloud the basic intent of Congress in passing this special valuation provision. Pursuant to section 2032A, "qualified" real property shall be valued as its actual qualified use value as farm property and not at its fair market value. Qualified real property is defined as: Real property located in the United States which was acquired from or passed from the decedent to a qualified heir of the decedent and which, on the date of the decedent's death, was being used for a qualified use by the decedent or a member of the decedent's family, but only if -- * * * (C) during the 8-year period ending on the date of decedent's death there have been *487 periods aggregating 5 years or more during which -- (i) such real property was owned by the decedent or a member of the decedent's family and used for a qualified use by the decedent or a member of the decedent's family, and (ii) there was material participation by the decedent or a member of the decedent's family in the operation of the farm or other business, * * *.
See section 2032A(b)(1)(C). It is respondent's position that the property in issue does not come within this definition because it was not qualified property for at least 5 of the 8 years preceding decedent's death. In the instant case, from November 6, 1973 through December 31, 1973, the record shows that the Donahoe family used the 100-acre plot in issue as Government set aside acres. During the entire year 1974, the acreage was used by decedent's grandson as pasture land and hay ground. During 1980 and 1981, the Brockmans used the 100-acre plot for various purposes relating to their farming operation. The period at issue, however, is the years 1975 through 1979, when the property was leased to two neighbors for pasture land. The parties stipulated that for the summer months of 1975 through 1979, the *488 100 acres of pasture land was leased out. It is respondent's position now that the testimony be Kenneth Brockman concerning the summer month rental provided additional information which indicates that the stipulation was not meant to delineate the technical terms of the lease, but was simply a short-hand reference to the fact that the pasture could not support the cattle after October or November of each year. When the grass in the pasture died out or was covered by snow, the cattle were moved off the land and into a barn, possibly a barn located on a neighboring farm. The Brockmans were not entitled to use the land during the winter months and it merely sat idle during that period until the lessee could regain use of the land the following summer. Under the language of section 2032A, respondent argues it would not be proper to aggregate these winter periods to meet the 5-year requirement necessary to support the special valuation. Petitioner, on the other hand, contends that if respondent wishes the disposition of this case to stand on whether or not the property was cash rented for more than 36 months during the 8-year period prior to decedent's death, we should decide in favor *489 of petitioner because the evidence is that it was cash rented for only the "summer" months during 5 of the 8 years in question, or at most 35 months (May through November or 7 months maximum per year times 5 years). We agree with petitioner's interpretation of the terms of the oral lease agreement. The parties stipulated that the 100-acre plot was leased to the neighbors for the summer months of 1975 through 1979. We do not find that the testimony of Kenneth Brockman changed this agreed-upon stipulation. Kenneth Brockman testified in the affirmative when asked if the property was leased during the summer months. While he also testified that the lessee agreed to rent the property for a minimum of 5 years, the parties had previously stipulated that the rental period was limited to the summer months. This testimony therefore is not in contradiction of the earlier stipulation. Moreover, we find that the property was qualified real property within the meaning of section 2032A during the winter months. The lessee could only actively use the land as pasture during the months when there was pasture grass on the ground. In the remaining months, the Brockmans exercised dominion and *490 control over the property and maintained a presence at the property and the upkeep of the property while the lessees took their cattle and went elsewhere. The Brockmans, therefore, had complete access to the 100 acres during the winter months. Moreover, had the Brockmans not leased the land at all and let the land sit idle during the less active winter months, these periods would undoubtedly have qualified as periods "qualified use." Thus, this record and these facts support the aggregation of these winter periods and establish that at minimum 5 of the 8 years were periods of qualified use, without looking to the Brockmans' overall farming activities to determine this issue. Inclusion of the aggregation concept in the Code and the regulations favors taxpayers in determining periods of qualified use. See section 20.2032A-3(c), Estate Tax Regs. We must next determine whether the Brockmans' activities with respect to the 100 acres constitutes material participation in farming or in another trade or business for purposes of section 2032A(b)(1)(C)(ii). *491 To qualify for special use valuation, there must be a showing that there was a material participation in the operation of the farm or business by the decedent or a member of decedent's family for periods totalling at least 5 of the 8 years preceding the date of decedent's death. Section 20.2032A-3(d), Estate Tax Regs. This is an issue to be determined from a review of all the relevant facts. Section 20.2032A-3(a), Estate Tax Regs. Essentially, this involves an assessment of the types of activities involved and the financial risks assumed. The regulation lists several nonexclusive factors considered relevant in determining the presence of material participation. Included in these factors are: 1. participation in management decisions and physical work on the land; 2. the furnishing of a substantial portion of the machinery and livestock used in the production activities; and 3. the maintenance of a principal residence on the premises. See section 20.2032A-3(e)(2), Estate Tax Regs. The regulations also provide that "material participation is present as long as all necessary functions are performed even though little *492 or no activity occurs during nonproducing seasons. " See section 20.2032A-3(e)(1), Estate Tax Regs. (Emphasis added.) For instance, in Mangels v. United States,828 F.2d 1324 (8th Cir. 1987), the Eighth Circuit determined that the activities of a court-appointed conservator on behalf of a deceased farmer with respect to leased farmland constituted "material participation" because certain minimum requirements had been satisfied, including a quarterly 2-hour inspection of growing crops and farm ground to check for needed fence and tile repair, monthly telephone or-in-person contact with the tenant, annual meetings with the tenant concerning cropping decisions, paying half the cost of fertilizers, seed and pesticides and occasional long-term management decisions. The court in Mangels further noted that in Sherrod, the Tax Court finding of material participation based on quarterly inspections of timber land twice a year for years "was no incorrect as a matter of law," see Mangels v. United States,supra at 1328, and went on to note that "the regularity *493 requirement * * * does not necessarily require the expenditure of a great deal of time nor frequent inspections. Rather, the sufficiency of the inspection must be measured in relation to the total need for such inspections." It is clear that each case must be reviewed in light of its individual set of facts. In the instant case, it is undisputed that no cattle could be pastured during the winter months. During the winter months, however, the Brockmans nevertheless took control of the land and maintained the land in a satisfactory state. The Brockmans built and repaired fences, mowed weeds, put in drain tiles and monitored drainage whenever necessary, winter or summer. Kenneth Brockman was on Tract IV, if not the specific 100 acres, at least once a week, both during the winter and summer months. Any damage to the property in question during this period would undoubtedly have been the responsibility of the Brockmans. In this sense, the Brockmans assumed the financial risk of any damage to the property during this time and particularly any damage which would jeopardize the terms of the summer lease. In short, the Brockmans' participation in the upkeep of the farmland during the *494 winter months was adequate to maintain this land as farmland during the nonproducing, or in this case nonproductive season. Thus, the Brockmans were materially involved with the physical upkeep and management of the land during the qualified winter months while the lessees had no contact with the pasture land during these months in any way, shape or form. We therefore do not agree with respondent's contention that the activities on the property must be viewed in the context of decedent's and Brockman's participation in the lessee's cattle operation. The focus of this discussion is the material participation of the decedent or the Brockmans in the winter months because the summer months are not the "qualified period" at issue. Finally, we point out that the section 2032A determination is a highly factual one, and we do not find petitioner's circumstances to be similar to the facts of the cases cited by respondent. This is not a case where the heirs leased the entire farm on a fixed price basis to an agribusiness or any other farm indefinitely. See Martin v. Commissioner,783 F.2d 81 (7th Cir. 1986), *495 affg. 84 T.C. 620 (1985). This is not a case where the taxpayer rented the farm property to another person for 5 year running and had little or no involvement in the activities of the farm use. See Estate of Abell v. Commissioner,83 T.C. 696, 701 (1984). This is a case where the qualified use and material participation was limited to 6 months a year for 5 consecutive years. The disqualifying use during the summer months does not "taint" the land for the entire year. The statute looks for qualified use during particular periods. This is the practical import of the statutory language permitting aggregation of qualifying periods to meet the qualified use requirement. After reviewing all of the foregoing factors and in light of the Congressional purpose behind the passage of section 2032A, we conclude that the 100-acre parcel is entitled to the section 2032A special valuation. We hold for petitioner. Decision will be entered under Rule 155.
Footnotes
1. All section references are to the Internal Revenue Code of 1954 as in effect for the date of decedent's date, and all Rule references are to the Tax Court Rules of Practice and Procedure. ↩