ESTATE OF H. FLOYD SHERROD, H. FLOYD SHERROD, JR., AND ESTALEE SHERROD SANDLIN, COEXECUTORS, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 5531–82.    Filed March 26, 1984.

---

*J. Gilmer Blackburn* and *Mark Daniel Maloney*, for the petitioner.
*Linda J. Wise*, for the respondent.

SHIELDS, *Judge*: Respondent determined a deficiency of $170,693.08 in the Federal estate tax due from the Estate of H. Floyd Sherrod. After concessions, the issues remaining for decision are: (1) Does the estate qualify for special use valuation under section 2032A[1] for certain land; (2) does the Tax Court have jurisdiction to review respondent's determination that the estate does not qualify to pay the estate tax in installments as provided in sections 6166 and 6166A; and (3) if the Tax Court has such jurisdiction, does the estate so qualify?

### FINDINGS OF FACT

Some of the facts have been stipulated. The stipulation of facts and exhibits attached thereto are incorporated herein by reference.

H. Floyd Sherrod, a citizen and resident of the United States, died on December 1, 1977. At his death, he was the sole beneficiary of a revocable trust which he had created on October 20, 1972, and with respect to which his two children and only surviving heirs were the trustees. After Mr. Sherrod's death, the children, H. Floyd Sherrod, Jr., and Estalee Sherrod Sandlin, qualified as the executors of his estate.

Subsequently, the executors filed a Federal estate tax return on which they reported that the estate included cash, life insurance, notes receivable, miscellaneous personal items, and 13 groupings of real property, including 1,478 acres of land on which special use valuation was claimed pursuant to section 2032A. On the return, the executors also made a timely election to pay the estate tax including any deficiency in installments under sections 6166 and 6166A.

---

[1] All section references are to the Internal Revenue Code of 1954 as in effect during the year in issue. All Rule references are to the Tax Court Rules of Practice and Procedure, unless otherwise indicated.

After an audit, the respondent issued a deficiency notice in which he determined, among other things, that the special valuation provisions of section 2032A were not applicable to any part of the 1,478 acres of land and that the estate did not qualify for installment payment of the estate tax. The executors, H. Floyd Sherrod, Jr., and Estalee Sherrod Sandlin, who were then residents of Alabama and Virginia, respectively, filed a timely petition for a review of the determinations made by the respondent.

Part of the 1,478 acres of land on which special use valuation was claimed was located in Colbert County, Ala. It consisted of two noncontiguous tracts, one of 258 acres and the other of 700 acres. The balance of the land on which the special valuation was claimed consisted of a single tract containing 520 acres located in Madison County, Ala., at a distance of about 100 miles from the Colbert County property.

At the death of Mr. Sherrod, the 700-acre tract in Colbert County was all in timber, mostly hardwoods, but with some pine and other softwoods. Of the 258-acre tract, 48 acres were in the same kind of timber, and the balance of 210 acres was in row crops (170 acres) and pasture (40 acres).

At Mr. Sherrod's death, all of the timberland in Colbert County had been in a state of natural forestation for at least 80 years. The last cutting of this timber prior to his death occurred in 1940 or 1941. This was a selective cutting and therefore the age of the timber on the land at his death in 1977 was about 45 to 50 years.

For at least 8 years prior to Mr. Sherrod's death, all of the cropland in Colbert County had been rented to an unrelated party under annual oral agreements for a fixed rent which was not dependent upon production. During the same period, the pasture land had not been put to any use.

The parties have stipulated that the timber on the Colbert County property at the death of the decedent had a fair market value of $43,200 and that such timber does not qualify for special use valuation under section 2032A. The parties have also stipulated that the fair market values and the special use values under section 2032A, if applicable, of the Colbert County land were as follows on the date of the decedent's death:

| Description | Acres | Fair market value | Special use value |
|---|---|---|---|
| Cropland | 170 | $188,579 | $50,678 |
| Pasture land | 40 | 44,371 | 4,916 |
| Timberland | 748 | 151,280 | 36,688 |
| Totals | 958 | 384,230 | 92,282 |

At the death of Mr. Sherrod, 360 acres of the 520-acre tract in Madison County were also in timber, mostly hardwoods. This land had been in a state of natural forestation for 40 or 50 years at its acquisition by the decedent in 1952. The age of the timber on the land at the date of his death was about 15 to 20 years, since the property had been subjected to a selective cutting in about 1960 or 1961.[2]

The balance of the 520 acres was in row crops (100 acres) and pasture (60 acres). From 1972 until the death of Mr. Sherrod in 1977, all of the cropland and 32 acres of the pasture land had been rented to Robert Spears, an unrelated party, under annual oral agreements for a fixed rent which was not dependent upon production. During these 5 years, Mr. Spears rotated corn and soybeans on the cropland and used the 32 acres of pasture land which he rented for access between the 100 acres of cropland and his adjoining farm. During this period, the remaining 28 acres of pasture land was not put to any use. For at least 5 years prior to 1972, all of the cropland and pasture land was rented to a Mr. Jones and a Mr. Bell for use in their cattle operations. The rental agreements with Mr. Jones and Mr. Bell were similar to those with Mr. Spears in that they were annual agreements for a fixed rent which was not dependent upon production.

Here, again, the parties have stipulated that the timber on the Madison County property had a fair market value of $14,800 on the date of Mr. Sherrod's death, and that such timber does not qualify for special use valuation under section 2032A. The parties have also stipulated that the fair market values and the special use values under section 2032A, if

---

[2]There is a contradiction in the record as to the age of this timber. Apparently through error, Mr. Bagwell, one of petitioner's experts, referred at one time to the timber as being 45 to 50 years of age at Mr. Sherrod's death, but Mr. Spears, the tenant on part of the property and the owner of an adjacent farm, testified that the timber was cut about 19 or 20 years before the trial or about 1960 or 1961, that both he and Mr. Sherrod were present, and that Mr. Sherrod supervised the cutting.

applicable, of the Madison County land on the date of death were as follows:

| Description | Acres | Fair market value | Special use value |
|---|---|---|---|
| Cropland | 100 | $83,655 | $34,304 |
| Pasture land (rented) | 32 | | |
| Pasture land (other) | 28 | 17,745 | 3,560 |
| Timberland | 360 | 78,800 | 18,459 |
| Totals | 520 | 180,200 | 56,323 |

As previously stated, H. Floyd Sherrod, Sr., was a citizen and resident of the ·United States. He was also a lifelong resident of Colbert County, Ala. He was born there in 1890 and grew up on a farm owned by this father who was a successful full-time farmer.

In 1917, Mr. Sherrod inherited part of the Colbert County land from his father's estate. He acquired the balance of the Colbert County property from other members of his family at different times between 1917 and 1949. He bought the Madison County property in a single transaction in 1952.

Mr. Sherrod completed the local college for teachers and thereafter taught school and served as a school principal until 1940. During this period, he also farmed on a part-time basis. His farming at this time consisted of the raising of some cattle, row crops, and timber on all or a part of the Colbert County property. In 1940, he retired from his position with the school system and, from then until 1952, devoted all of his time to farming and to managing and looking after the properties in Colbert and Madison Counties and his other real estate holdings which, by the time of his death, included some residential and commercial rental properties as well as some real estate developments of a limited nature. His farming during this period included some sharecropping arrangements with respect to the cropland.

In or about 1952, when he was 62 years of age, Mr. Sherrod ceased to engage in part of his farming activities. At this time, he disposed of the 40 to 50 cattle and whatever farm equipment he owned and, from then until October of 1972, he made no attempt, either directly or through sharecropping arrangements, to personally look after, raise, or grow any row crops or

cattle. Instead, he rented out those portions of the properties which were suited for row crops and pasture. These rentals were on the basis of annual oral agreements which were negotiated and supervised by Mr. Sherrod, personally.

He, however, continued during this 20-year period to personally look after his timberland in order to protect it from trespassers, insect infestation, and disease. To accomplish this, he either alone, or at times with his son, personally inspected the timberland several times a year. Between inspections, he or his son maintained regular contact with the tenants of the pasture and cropland, as well as with adjoining landowners and other people in the community. He also paid all of the taxes on the properties in Colbert and Madison Counties.

When the timber on the Colbert County property was removed in 1940 or 1941, the selective cutting was done by Walker Lumber Co. under an oral agreement negotiated by Mr. Sherrod with Mr. Walker. The agreement apparently amounted to a sale of the standing timber by Mr. Sherrod, with the price being based on the board feet obtained from the cutting. From the record, it appears that a limited cutting of at least a portion of the Colbert County property was done about 1931 by Walker Lumber Co. under an oral agreement with Mr. Sherrod.

The cutting of the Madison County timber which occurred about 1960 or 1961[3] was apparently done under the direct supervision of Mr. Sherrod. A sawmill was in place on the property, and Mr. Sherrod was present 5 days per week during the cutting. Whatever agreement existed, if any, with respect to this cutting, was oral and was negotiated by him.

In October of 1972, Mr. Sherrod, who was then 82 years of age, entered a nursing home after executing a revocable trust in which he placed all of his real property including the 1,478 acres. He was the sole beneficiary of the trust during his life, and his son and daughter were the trustees. They were also the beneficiaries of the trust at his death.

Mr. Sherrod spent the remainder of his life in the nursing home while his son, H. Floyd Sherrod, Jr.,[4] as one of the trustees of the revocable trust, performed the managerial

---

[3]See note 2 *supra.*

[4]While not exactly clear, the record indicates that the daughter, the second trustee, did not exercise any authority with respect to the property until after the decedent's death.

services with respect to the 1,478 acres that had been performed in the past by his father. Shortly after being named a trustee, the son moved from Georgia, where he was a professor at the University of Georgia Law School, to Alabama, where he became employed full-time as an attorney with the Legal Services Corp. This move permitted him to perform whatever services were necessary in connection with the management and control of the 1,478 acres, as well as the other properties in the trust. As his father had before him, he (1) negotiated annual rental agreements with tenants on the pasture and cropland; (2) periodically inspected the timberland and regularly checked with the tenants, not only to make sure that they were performing as expected, but also to ascertain whether or not they were aware of any present or potential problem with respect to the timberland; (3) maintained contact with adjoining landowners and other people in the community for the same reason; and (4) saw to it that all local taxes on the properties were paid.

The total acreage of 1,478 for which the special use value was claimed falls naturally into three types of land or soil. The first type is represented by the 270 acres (170 in Colbert County and 100 in Madison County) used for row crops. This land is relatively level and naturally fertile, being mostly bottom or lowland, and is well suited for row crops such as corn and soybeans. The second type consists of the 1,108 acres (748 in Colbert County and 360 in Madison County) in timber. This is rough mountain upland with deep soil for the most part which is suitable for growing hardwood timber but is not suitable for row crops or pasture. The third type is represented by the 100 acres (40 in Colbert County and 60 in Madison County), classified by the parties as pasture land. Actually, however, this property is almost wasteland. It is the rolling, hilly land lying between the other two types. It has thin soil with some rock and brush, and is unsuitable for row crops, because it is not level, and for timber, because its soil is thin.

The use made of the three types of land by the decedent from 1952 to 1972, and by his son, as the trustee of the trust, from 1972 to the decedent's death in 1977, was consistent with the natural state of the property. In other words, each type of land was put to the use it was most suited for by its nature. Furthermore, the management of the acreage during this 25-

year period was consistent with the principles of good land management as recommended to, and practiced by, the owners of other property of similar nature, size, and location.

The number of acres owned by Mr. Sherrod and devoted to timber (1,108) was almost 7 times greater than the minimum of 160 acres considered necessary for a successful timber operation. The number also represented more than the amount of acres owned by over 92 percent of the private nonindustrial timber growers in northern Alabama and over 99 percent of the private noncorporate owners of timberland in the United States.

Under the circumstances of this particular case, the practice followed by the decedent and his son of renting the cropland to other parties for fixed, annual rents was also consistent with good land management. The two parcels of cropland, 170 acres in Colbert County and 100 acres in Madison County, were each too small to warrant the purchase of the equipment necessary to profitably use them for row crops, and they were too distant from each other to work as a unit. Consequently, the practice adopted by the decedent of renting these parcels to other parties, such as Robert Spears, who already had the necessary equipment, was not only consistent with good land management but also provided the cash with which to pay annual expenses such as local taxes. The same reasoning and conclusion would be equally applicable to the pasture land of 40 acres in Colbert County and 60 acres in Madison County.

The parties agree that the adjusted value of the gross estate for the purpose of applying both the 50-percent test of section 2032A(b)(1)(A) and the 25-percent test of section 2032A(b)(1)(B) is $869,806.45. They also agree that at Mr. Sherrod's death, both the Colbert County property and the Madison County property passed to qualified heirs within the meaning of section 2032A(e)(1).

OPINION

*Special Use Valuation*

In this case, we must decide whether the estate qualifies for the special use valuation on the 1,478 acres of land under

section 2032A.[5] Prior to the enactment of section 2032A as part of the Tax Reform Act of 1976, real property, generally speaking, was included in an estate at its fair market value based upon its highest and best use. Section 2032A, however, permits certain qualifying farms and other real property used in a trade or business to be valued for estate tax purposes according to their actual use at the time of the decedent's death. In other words, the value is arrived at by capitalizing the income derived from the actual use of the property rather than by adopting its fair market value based upon its highest and best use. Sec. 20.2032A-3, Estate Tax Regs.

By the enactment of section 2032A, Congress intended to limit its application to so-called family farms or businesses.[6]

---

[5]The relevant part of sec. 2032A is as follows:

SEC. 2032A(b). QUALIFIED REAL PROPERTY.—

(1) IN GENERAL.—For purposes of this section, the term "qualified real property" means real property located in the United States which was acquired from or passed from the decedent to a qualified heir of the decedent and which, on the date of the decedent's death, was being used for a qualified use by the decedent or a member of the decedent's family, but only if—

(A) 50 percent or more of the adjusted value of the gross estate consists of the adjusted value of real or personal property which—

(i) on the date of the decedent's death, was being used for a qualified use by the decedent or a member of the decedent's family, and

(ii) was acquired from or passed from the decedent to a qualified heir of the decedent.

(B) 25 percent or more of the adjusted value of the gross estate consists of the adjusted value of real property which meets the requirements of subparagraphs (A)(ii) and (C),

(C) during the 8-year period ending on the date of the decedent's death there have been periods aggregating 5 years or more during which—

(i) such real property was owned by the decedent or a member of the decedent's family and used for a qualified use by the decedent or a member of the decedent's family, and

(ii) there was material participation by the decedent or a member of the decedent's family in the operation of the farm or other business, and

(D) such real property is designated in the agreement referred to in subsection (d)(2).

(2) QUALIFIED USE.—For purposes of this section, the term "qualified use" means the devotion of the property to any of the following:

(A) use as a farm for farming purposes, or,

. (B) use in a trade or business other than the trade or business of farming.

[6]The intent of Congress in this respect is set out in the committee reports as follows:

"Your committee believes that, when land is actually used for farming purposes or in other closely held businesses (both before and after the decedent's death), it is inappropriate to value the land on the basis of its potential "highest and best use" especially since it is desirable to encourage the continued use of property for farming and other small business purposes. Valuation on the basis of highest and best use, rather than actual use, may result in the imposition of substantially higher estate taxes. In some cases, the greater estate tax burden makes continuation of farming, or the closely held business activities, not feasible because the income potential from these activities is insufficient to service extended tax payments or loans obtained to pay the tax. Thus, the heirs may be forced to sell the land for development purposes. Also, where the valuation of land reflects speculation to such a degree that the price of the land does not bear a reasonable relationship to its earning capacity, your committee believes it unreasonable to require that this "speculative value" be included in an estate with respect to land devoted to farming or closely held businesses. [H. Rept. 94-1380 (1976), 1976-3 (Vol. 3) C.B. 735, 755-756.]"

Consequently, to qualify for the "special use" value, the following conditions must be met: (1) The decedent at the time of his death must have been a citizen or resident of the United States; (2) the property for which the special use value is sought must be located within the United States; (3) the property must pass to a member of the decedent's family who qualifies under section 2032A; (4) such property must represent 50 percent or more of the adjusted value of the gross estate and must have been used at the decedent's death for a qualified purpose, i.e., as a farm or in a trade or business by the decedent or a member of his family; and (5) 25 percent or more of the adjusted value of the gross estate must consist of such property which during 5 of the 8 years preceding the decedent's death was used for a qualified purpose by the decedent or a member of his family and there must have been material participation by the decedent or the member of his family in the operation of the farm or other business. See *Estate of Coon v. Commissioner,* 81 T.C 602 (1983); *Estate of Cowser v. Commissioner,* 80 T.C. 783 (1983), on appeal (7th Cir., July 12, 1983); *Estate of Geiger v. Commissioner,* 80 T.C. 484 (1983).

The parties agree that in this case all of the above conditions have been met except those listed at (4) and (5). In other words, their disagreement is limited to whether or not property representing 50 percent or more of the adjusted value of the gross estate was being used at the decedent's death for a qualified purpose by the decedent or a member of his family, and whether or not 25 percent or more of the adjusted value of the gross estate is represented by property which was used during 5 of the 8 years preceding the decedent's death for a qualified purpose in which there was material participation by the decedent or a member of his family.

The respondent argues that no part of the 1,478 acres was being used for a qualified purpose at the decedent's death, or at any time during the 8 years preceding his death, by the decedent or a member of his family. Consequently, he contends, and urges us to find, that special valuation under section 2032A is not applicable to any part of such acreage.

The executors argue that from 1952 to the date of his death in 1977, the decedent or a member of his family used all of the 1,478 acres in a timber farming business in which they

materially participated. Consequently, they contend that the entire acreage qualifies for the special valuation provided by section 2032A. For the reasons set out hereinafter we agree with the executors.

Insofar as applicable to this case, the term "qualified real property" as used in section 2032A(b)(1) means real property being used at the decedent's death for a qualified use by decedent or a member of his family provided that during 5 of the 8 years preceding his death, the decedent or a member of his family owned the property, used it for a qualified use, and materially participated in the operation of the farm or other business. The term *qualified use* includes "the devotion of the property to * * * use as a farm for farming purposes." Sec. 2032A(b)(2). The term *farm* "includes * * * woodlands." Sec. 2032A(e)(4). The phrase *farming purposes* includes "the planting, cultivating, caring for, or cutting of trees." Sec. 2032A(e)(5)(C)(i).

As pointed out in our findings, the decedent, from 1952 to 1972, controlled and managed the 1,478 acres by devoting each type of land included therein to its best natural use. He left in a state of natural forestation the land suitable for timber (75 percent). He leased out to other parties for cash rents the part of the property (25 percent) which was not suitable for growing timber (the pasture and cropland). This practice not only provided him with cash to meet ongoing expenses such as property taxes but also permitted him to make use of the parcels which were otherwise too small and too distant from each other to permit their profitable use.

During this period, the decedent controlled, supervised, and managed the acreage by (1) paying the local property taxes each year; (2) inspecting the timberland several times each year; (3) regularly contacting the tenants, adjoining landowners, and other people in the neighborhood so as to ascertain what, if anything, needed to be done to protect the timber from trespassers, fire, insects, and disease; (4) negotiating each year the rental agreements with the tenants of the pasture and cropland; and (5) deciding each year, or at least from time to time, whether or not he should permit his investment to remain in the acreage.[7]

---

[7] At his death, the investment had a fair market value of over $630,000.

From 1972 to 1977, the acreage was held by the revocable trust, and all of the activities the decedent had undertaken during the previous 20 years were provided, with respect to the property, by the son as the trustee of the trust. Under section 2032A, the indirect ownership of the acreage by the trust and the activities of the son as the trustee are attributable to the decedent, provided the acreage was used in an "active business such as a manufacturing, mercantile, or service enterprise, or to the raising of agricultural or horticultural commodities, as distinguished from passive investment activities." Sec. 20.2032A–3(b)(1), Estate Tax Regs.

Therefore, subject to our finding that their activities constituted an active business, the conclusion is inescapable that from 1952 until the decedent's death in 1977, a period of 25 years, the decedent and the son had the acreage under their exclusive control and made every management decision with respect to the property during the entire period. Furthermore, as also stated in our findings, the activities performed by them and the manner in which the properties were managed were consistent with the principles of good land management as recommended to, and practiced by, the owners of other property of a similar nature, size, and location.

We further conclude, therefore, (1) that from 1952 through 1972, the decedent managed an active farm business which consisted primarily of planting, cultivating, growing, and caring for 1,108 acres of timber;[8] (2) that the active farm business also included the management of another 370 acres not suitable for timber but which constituted part of the total acreage on which the timber was located; (3) that the management of the 370 acres was performed in such a manner that it was an aid to, an integral part of, and inseparable from the management of the 1,108 acres of timber; (4) that from 1972 until the decedent's death in 1977, the aforesaid active farm business was conducted by the decedent's son as one of the trustees of a revocable trust which was created by the decedent and of which he was the sole beneficiary during his life; (5) that the decedent and the son materially participated

[8]See secs. 20.2032A–3(b)(1) and 20.2032A–3(g), example (7), Estate Tax Regs. See also *St. Germain v. Commissioner*, T.C. Memo. 1959–73.

in said farm business during the entire 25 year period;[9] (6) that the total agreed value of the acreage used in the aforesaid farm business of $564,430, is more than 25 percent or even 50 percent of the adjusted value of the gross estate of $869,806.45; and (7) that the entire 1,478 acres constitute qualified real property under section 2032A(b).

We have carefully considered respondent's argument to the effect that the cropland and the pasture land should be considered separately from the timberland. However, the record as a whole establishes beyond question that the entire acreage had been held and managed by the decedent and his trustee for at least 25 years as a single logical unit.

We realize, of course, that all of the 40 acres of pasture in Colbert County and 28 acres of the pasture in Madison County were not put to any use during 5 of the 8 years preceding the decedent's death, but we have found that this land was not suitable for timber or crops and apparently had little if any rental value as pasture. Furthermore, it represents only 4.6 percent of the total acreage, 11 percent of the total fair market value, and 5.7 percent of the special use value. Consequently, it has a de minimis effect upon the overall operation and upon our thinking, and its removal would not disqualify the remainder of the property under section 2032A.

We have also considered and rejected the respondent's argument that the activity of the decedent and his trustee was not extensive enough to constitute a business because they failed to construct fire trails, prune dead and undesirable growth, and thin the timber from time to time as recommended in certain treatises on timber farming. The argument is not acceptable, however, not only because the respondent has failed to establish that the recommended procedures are practical or otherwise feasible when considered in connection with the rough, mountainous terrain involved in this case, but also because the contention is somewhat analogous to arguing that a landscape artist is not in a business because he fails to include certain rocks, clouds, trees, or other items in his paintings which a different artist would include when doing the same scenes.

---

[9]See sec. 20.2032A–3(g), example (7), Estate Tax Regs.

Furthermore, the fact that the control and management of the business did not consume a great deal of time does not alter our conclusion. The decedent and his trustee made every managerial decision and performed every act that was necessary to carry on the business for 25 years. The type of business and the product grown in timber farming does not require the expenditure of a great deal of time or labor. This fact is recognized in the respondent's regulations which require that a timber or other farmer with long nonproducing seasons need devote only such time as is needed to perform all necessary business functions in order to be considered as materially participating in the farm operation. Sec. 20.2032A–3(e)(1), Estate Tax Regs.

### Jurisdictional Issue

In his notice of deficiency, respondent determined that the estate did not qualify to pay the estate tax in installments as provided in section 6166 or section 6166A[10] because the decedent did not own an interest in a closely held business. Respondent stated further:

If a petition to the United States Tax Court is filed against the deficiency proposed herein, this issue should be made a part of the petition to be considered by the Tax Court in any redetermination of your tax liability.

The petitioner argues that since the decedent's activities constituted a business with respect to the property for which petitioner elected special use valuation, and since the business interest satisfies the two percentage tests of section 2032A(b)(1), the estate is entitled to pay the estate tax in installments. Contrary to the statement in his statutory notice, the respondent now rejoins that inasmuch as the denial of the election to pay the estate tax in installments is not attributable to a deficiency, the Tax Court does not have jurisdiction to decide the matter. We agree with respondent.

This Court has pointed out repeatedly that its jurisdiction is strictly limited by statute and that it does not have the authority to enlarge upon the statutory grant of jurisdiction. *Estate of Young v. Commissioner*, 81 T.C. 879 (1983) (Court

---

[10]Sec. 422(d), of the Economic Recovery Tax Act of 1981, Pub. L. 97–34, 95 Stat. 315, repealed sec. 6166A applicable to estates of decedents dying after Dec. 31, 1981.

reviewed); *Medeiros v. Commissioner,* 77 T.C. 1255, 1259 (1981); *Breman v. Commissioner,* 66 T.C. 61, 66 (1976). See also sec. 7442; Rule 13.

Section 6213 confers jurisdiction on the Tax Court to redetermine deficiencies in income, estate, gift, and certain excise taxes. In addition, the Court is authorized to enter declaratory judgments with respect to certain specific matters. See secs. 7428, 7476, 7477, and 7478. The Commissioner's determination as to whether or not an estate qualifies for the payment of estate tax in installments under section 6166 or section 6166A does not create, or affect the amount of, a deficiency. Furthermore, it is not a matter with respect to which the Tax Court has been granted authority to issue declaratory judgments, although a statute to that effect was proposed in the House of Representatives during discussions of the Tax Incentive Act of 1981. The committee reports state:

Under present law, the decision of the Internal Revenue Service to deny an election to pay all or a portion of the estate tax attributable to closely held businesses generally is not subject to judicial review because no deficiency is involved. The committee believes that taxpayers should be provided with a judicial forum to resolve disputes involving an estate's eligibility for the deferral of estate tax attributable to interests in closely held businesses.

     \*     \*     \*     \*     \*     \*     \*

Explanation of Provision.

     \*     \*     \*     \*     \*     \*     \*

In addition, the [proposed] committee bill provides a procedure for obtaining a declaratory judgment with respect to (1) an estate's eligibility for deferred payment of estate taxes attributable to an interest in a closely held business under section 6166, \* \* \*. Jurisdiction to issue a declaratory judgment is limited to the United States Tax Court and the determination of that court is final and conclusive and is not reviewable to any other court.

H. Rept. 97–201 (1981), 1981–2 C.B. 352, 388–389. The provision, however, was deleted in conference. See H. Rept. 97–215 (Conf.) (1981), 1981–2 C.B. 481, 511.

We conclude, therefore, that we do not have the statutory authority to review the respondent's determination that the estate cannot use the installment payment provisions of sections 6166 and 6166A. Nevertheless, it appears that our

findings and decision with respect to the other issue should also dispose of this one.

To reflect the foregoing and the concessions of the parties.

*Decision will be entered under Rule 155.*