ESTATE OF ELIZABETH COFFING, DECEASED, THOMAS H. COFFING, EXECUTOR, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Estate of Coffing v. Commissioner
Docket No. 20452-81.
United States Tax Court
T.C. Memo 1987-336; 1987 Tax Ct. Memo LEXIS 336; 53 T.C.M. (CCH) 1314; T.C.M. (RIA) 87336; July 8, 1987. *336 Held: Decedent's activities with respect to the operation of her two farms did not constitute "material participation" within the meaning of section 2032A(b)(1)(C)(ii), I.R.C. 1954. Accordingly, petitioner's election of special use valuation for the farms is disallowed. Estate of Coon v. Commissioner,81 T.C. 602 (1983), followed. Lester M. Ponder and Douglas P. Long, for the petitioner. Elsie Hall and Russell D. Pinkerton, for the respondent. CHABOT
MEMORANDUM FINDINGS OF FACT AND OPINION CHABOT, Judge: Respondent determined a deficiency in Federal estate tax against petitioner in the amount of $62,505.59. After concessions, the issue for decision is whether decedent materially participated in the operation of her farms within the meaning of section 2032A(b)(1)(C)(ii)[1], so as to permit petitioner to qualify for the benefits of special use valuation under section 2032A. FINDINGS OF FACT Some of the facts have been stipulated; the stipulation and the stipulated exhibits are incorporated herein by this reference. When the petition *337 was filed in the instant case, Thomas H. Coffing (hereinafter sometimes referred to as "Thomas"), the duly appointed, qualified, and acting executor of the Estate of Elizabeth Coffing, resided in Carmel, Indiana. The Last Will and Testament of Elizabeth Coffing was admitted for probate by the Benton Circuit Court, Benton County, Indiana. As of the date of her death, Elizabeth Coffing (hereinafter sometimes referred to as "decedent") resided with Thomas, her only child, in Carmel, Indiana. Decedent was born on July 3, 1883, and died on September 27, 1977. On the date of her death, decedent owned fee simple interests in two farms -- a 60-acre farm in Benton County, Indiana (hereinafter referred to as "the Benton farm"), and a 160-acre farm in Warren County, Indiana (hereinafter referred to as "the Warren farm"). The Warren farm was jointly owned by decedent and Thomas, with each owning a one-half interest in the tract on the date of decedent's death. Decedent was born on the Warren farm and lived there for 39 years until she married Thomas Coffing, Sr., in 1922. The Warren farm was originally a 188-acre tract and had been acquired by decedent's grandfather. Decedent inherited a *338 one-half interest in the 188-acre farm in 1915. The other one-half interest was held by decedent's brother and that interest passed to Thomas on his uncle's death in 1943. Decedent's brother had farmed the 188-acre farm until his death in 1943 and since that date the soil has not been tilled personally by a family member. In about 1965, decedent and Thomas sold 68 acres of the 188-acre farm and acquired another 40 acres as joint tenants in order to complete the 160-acre Warren farm which existed as of the date of decedent's death. When decedent married Thomas Coffing, Sr. [2], she moved to Oxford, Indiana, which was about one-half to three-fourths of a mile from the Benton farm and about 6 miles from the Warren farm. In 1937, Thomas Coffing, Sr., bought the Benton farm as an investment. Decedent inherited the Benton farm from her husband on his death, in November 1938. From 1922 until she died, decedent owned a house in Oxford. She did not reside on either farm at any time after she married. Decedent was a high school graduate and had received some training as a practical nurse. From about 1944 to *339 1964, decedent was employed by the Farmcraft Seed Company each fall to sort seed corn as it passed over a conveyor belt. Each year she was employed from early September until late October or early November sorting seed corn for about 10 hours a day, 5 to 6 days a week. Decedent had knee surgery about 1964; she did not drive a car thereafter. As was decedent's custom, in December 1969 she traveled alone from Oxford to Texas City, Texas, to visit with Thomas and his family for the winter. During this visit, on February 17, 1970, she suffered an apparent light stroke and was hospitalized in Texas City until April 11, 1970, when she returned to Thomas' home. On April 17, 1970, decedent entered a nursing home in Le Marque, Texas, while Thomas and his family made a business trip out of town. While in the nursing home decedent was admitted to the hospital with a broken hip and leg. On May 15, 1970, she was moved to Texas City Nursing Home to continue her recuperation and to receive physical therapy. On August 26, 1970, decedent was released and returned to Thomas' home to resume her visit and recuperation. In April 1971, she returned to her home in Oxford, Indiana. In November 1971, *340 decedent visited with Thomas and his family in Texas City; she returned to Oxford in early 1972. In the fall of 1972, decedent fell at her home in Oxford and was treated at a hospital in Lafayette, Indiana. She was then moved to a nursing home in Lafayette for further recovery and then to another nursing home in Oxford. She was released during the Christmas season of 1972 and went to Texas City to visit Thomas and his family. She returned to Oxford about May 1973. [3] In December 1973, decedent visited with Thomas and his family in Indianapolis; she returned to Oxford in April 1974. In November 1974, decedent visited with Thomas and his family in Indianapolis; she returned to Oxford in April 1975. Decedent fell again in July 1974 and in November 1975. These falls also required hospitalizations in Lafayette. [4] *341 After decedent's fall in November 1975, Thomas concluded that it was too risky for her to live alone in her Oxford home. Accordingly, she took up residence with Thomas in Indianapolis. Thomas bought a larger house, in Carmel, Indiana, to provide adequate room for his family and decedent. They moved to Carmel in December 1975. Decedent did not physically reside at her home in Oxford at any time after November 1975 although she always considered it her home and maintained her voting residence there. About February 1976, decedent was treated for a cancerous condition at a hospital in Indianapolis on an out-patient basis for several weeks. In late June 1976, decedent entered a nursing home in Oxford and was released in August of that year. In late August of 1976, decedent fell at her son's residence and was taken to a hospital in Indianapolis. On September 17, she was admitted *342 to the Americana Healthcare Center in Indianapolis as a custodial patient. On September 20 she fell and broke her leg. Surgery and complications caused hospitalization until December 4, 1976, when she returned to the Americana Healthcare Center. On January 6, 1977, she fell again and was admitted to the hospital. On her release she returned to the Americana Healthcare Center and on January 14 she was moved to the Colonial Crest Convalescent Center. On September 10, 1977, decedent was moved to the Carmel Care Center in Carmel, in order to be closer to Thomas' residence. On September 23 she fell during an outing and was given emergency treatment at a hospital in Indianapolis. She thereafter returned to the Carmel Care Center. On September 26, 1977, decedent was found unconscious and died at the hospital the following day. In 1965, Farmcraft Service, Inc. (hereinafter sometimes referred to as "Farmcraft") managed about 130 farms with total combined area of about 35,000 acres. In 1982, it managed about 125 farms with a total combined area of about 32,000 acres. Farmcraft operates in 25 counties in the northwest quadrant of Indiana and has offices located in Logansport and Oxford. *343 Farmcraft had 7 employees in 1965 and had 11 in 1982. Only 1 of the 11 employees was not a college graduate with a degree in agriculture. Several employees have specialties such as marketing, seeds, or chemicals but all employees manage some of the farms. Farmcraft buys certain supplies such as seed and herbicides in bulk so that it can get a quantity discount, which it then passes on to tenants and owners. Farmcraft selects the seed in October of each year based on test results from its own corn plot, university tests, and other available information. Fertilizers and herbicides are selected and purchased in the fall and spring based, in part, on recommendations of the employee with expertise in that area. On September 1, 1965, decedent entered into a farm service contract with Farmcraft with respect to the Warren farm. In 1974, an oral contract on the same terms was entered into between decedent and Farmcraft with respect to the Benton farm. These contracts continued until decedent's death. Anton Brazes (hereinafter referred to as "Brazes") was the Farmcraft employee responsible for managing the Warren farm from 1965 through the date of decedent's death, and for managing the Benton *344 farm from 1974 through the date of decedent's death. Brazes is a graduate of the University of Illinois with a Bachelor of Science degree in agriculture. He was first employed by Farmcraft in November 1950 and became Farmcraft's president at some time after decedent's death. Although Brazes was not related to decedent, he was her close personal friend from 1950 until her death. Brazes rented a room from decedent from 1950 until June 1953 when he married. [5] Beginning in 1953, he and his family visited decedent nearly every Sunday when she was in Oxford. Brazes' children received small remembrances in decedent's will. Brazes executed the 1965 farm service contract on behalf of Farmcraft. Under the terms of the contract, decedent was obligated to maintain sufficient funds in a farm account at the State Bank of Oxford. Brazes and John R. Hays, as representatives of Farmcraft, were authorized to sign checks on this account to pay taxes, interest, insurance, management charges, cash payments to the owner, and all other expenditures involved in operating the Warren farm. The farm service contract provided that Farmcraft's duties were as *345 follows: 1. The Manager [Farmcraft] agrees to study this property carefully with respect to: (a) Soil types, their lime and fertilizer needs and the crops adapted to them. (b) Proper rotation, from standpoint of profits and soil improvements. (c) Adequacy of drainage system and feasible improvements. (d) Proper use of existing buildings and profitable changes. (e) Arrangement of fields and fencing for the most feasible layout. 2. Manager shall select tenants (and hired labor on farms under direct operation) when a change is desired, and shall have complete tenant control, including the negotiation of rental terms and the signing of leases, subject to the Owner's approval. (It is understood that leases shall not be made for more than a one year term without Owner's consent). 3. Type of tenure shall be determined by mutual agreement of Owner and Manager. 4. Manager agrees to keep a complete record of all receipts and expenses and to submit a statement of same to the Owner on a quarterly basis. A summary report shall be submitted at the close of each calendar year. 5. Sales of Owner's share of grain, hay, and/or livestock shall be made by manager.
6. Manager shall procure seed, *346 limestone, fertilizer, and other materials and see that needed repairs are made to fences, buildings, and drainage systems and shall pay for cost of same from the above bank account. 7. Anticipated major capital expenditures shall be referred to Owner for approval. 8. It is agreed that a cropping and fertility program, consistent with good soil improvement and conservation practices shall be developed and maintained. 9. Governmental Farm Programs shall be complied with if consistent with the best interests of the farm(s) and Owner. [Underscored items typed onto printed contract.] The Warren farm was leased to John Skoog (hereinafter sometimes referred to as "Skoog") of Oxford, from 1965 through 1977, under a written lease dated December 1, 1965. Under the terms of this lease, Skoog agreed to turn over to decedent as rent one-half of all corn, oats, wheat, soybeans, hay, rye, clover seed, and all other crops produced on the Warren farm. The lease provides as follows with respect to the division of crop expenses: The lessor and lessee individually and jointly agree to furnish the following in the proportions specified herewith: Lessor
Lessee
Seed oats
1/2
1/2
Seed corn
1/2
1/2
Seed wheat
1/2
1/2
Soybean seed
1/2
1/2
Legume and grass seed: for harvest
1/2
1/2
for intercrop
1/2
1/2
Fertilizer Row
1/2
1/2
Fertilizer Plow Under
1/2
1/2
Limestone Spread
none
all
Limestone and Hauling
all
none
Inoculation
1/2
1/2
Combining wheat
1/2
1/2
Combining oats
1/2
1/2
Combining soybeans
1/2
1/2
Shelling corn
1/2
1/2
Hay Baling
none
all
Straw Baling
none
all
Spraying Crop Weeds
1/2 material
1/2 mat. & app.
Spraying Brush
all material
apply
Crop Herbicides
1/2 material
1/2 mat. & app.
*347 [Underscored items, and all items under the "Lessor" and "Lessee" headings, handwritten onto printed contract.] Crop plans were to be agreed upon jointly by Skoog and decedent (or her agent) so far as possible. Final decisions on rotations and crop plans rested with decedent or her agent. From December 1, 1965, until decedent's death, Skoog supplied all machinery and implements utilized on the Warren farm. Brazes signed the lease for Farmcraft as decedent's agent, along with Skoog and decedent. Decedent's duties and obligations under this lease were as follows: The lessor agrees to: 1. Furnish above described lands together with improvements as specified, damage from unavoidable causes excepted. 2. Be held responsible for all taxes on land and such improvements thereon as are owned by him. 3. Furnish all material for repairing existing buildings and all material and skilled labor for constructing new buildings. 4. Furnish all material for constructing new fences and for repairing old fences. 5. Furnish tile for new drains and for replacing broken tile in old drains. 6. Repay lessee the portion of the cash costs incurred by him from which incomplete benefit has been recovered *348 as per the following schedule. * * * Skoog's duties and obligations under this lease were as follows: 1. Operate this farm in good season and in a careful manner, and to follow the farm program and practices designated by the lessor or his agent as appropriate for this farm. 2. Furnish all man labor, machinery, and equipment necessary for doing work in proper season except no exceptions.
3. Furnish all unskilled labor for repairing buildings, tile drains and fences, and for constructing not to exceed 40 rods of new fence each year. 4. Promptly haul out and spread on fields, agreed upon by lessee and lessor (or his agent) all manure made on this farm. 5. Burn, sell or remove no cornstalks or straw from farm without approval of the lessor (or his agent). 6. Cut and destroy all noxious weeds before they seed, and to mow fence rows and roadsides. 7. Properly plant and care for trees and shrubbery provided by lessor. 8. Prevent hogs rooting in pastures and lots, and to keep stock from packing fields in wet weather. 9. Use reasonable precautions to prevent erosion and to keep tiles and ditches in working order. 10. Not sublet or assign any of this property or any part thereof *349 (except with the written consent of lessor or his agent). 11. Use this property for no unlawful purpose. 12. Keep an accurate record of all income and expenses connected with the joint farm business and a complete inventory of jointly owned grain, stock, feed, and supplies, and upon request to provide said data to the lessor (or his agent). 13. Operate no other farm land without previous consent of lessor (or his agent). 14. Make reasonable effort to control animal and insect pests on this property. 15. Erect all temporary fences.
[Underscored items handwritten onto printed contract.] The contract between decedent and Farmcraft provided as follows with respect to fees: The Owner agrees to pay the Manager 9% of the Owner's share of all receipts from the above described property to be calculated on an accural [sic] basis (sale of lands and capital equipment excepted). * It is further agreed that the minimum compensation to the Manager shall not be less than $172.80 annually, of which amount $43.20 shall be due and payable at the end of each quarter. In case the aforementioned percentage of receipts exceeds the minimum amount specified the balance shall be due and payable at the *350 time the Manager presents his annual accounts. Reasonable compensation for special trips of Manager to purchase livestock or other similar items shall be paid in addition to the above charges, but such expenses are not to be incurred without the approval of the Owner. It is further agreed that the management fee for the part year starting 9-1-65 and ending 12-31-65 shall be $45.00. Following December 31, 1965 (the above listed provisions shall apply.) The 9-percent fee was set according to the size of the farm and the type of farming operation, i.e., grain as opposed to livestock. The fee for managing a grain farm did not vary regardless of the responsibilities delegated to the manager. Decedent paid farm management fees in the amounts of $1,567.51 in 1974, $2,090.28 in 1975 and $3,979.49 in 1976. In 1965, shortly after decedent and Farmcraft signed the farm service contract, she and Brazes discussed and selected the basic manner of operating the farm. That original plan did not change. The goal was economic feasibility rather *351 than to run the farm at the least cost or as a show place. Brazes tried to market the crops in such a manner that they brought a price in the top one-third of the market. Decedent did not provide any machinery, equipment, livestock, or storage facilities with respect to either the Warren farm or the Benton farm. Decedent paid her share of the expenses of both of these farms. Farmcraft was authorized under the contract to make daily operating decisions and did not have to consult with decedent as to what seed, herbicide, or fertilizer to purchase or when or where to market the crops. Brazes was the Farmcraft employee principally responsible for carrying out Farmcraft's duties concerning the Warren and Benton farms. Although Brazes sometimes discussed these matters with decedent, she rarely vetoed his recommendations. [6] *352 Farmcraft sent quarterly and yearly summary reports to decedent. These reports did not include copies of invoices, bank statements, or cancelled checks. Decedent typically made a moderate study of the reports and discussed them with Brazes. Decedent had a continuing strong interest in the operation of her two farms. The farms were a natural part of her life and she frequently spoke of them in normal conversation. Brazes visited decedent about once a month when she was in Oxford to discuss almost exclusively the farm operations. He also took decedent by car to visit the Warren farm about once a month from May through October during 1969, 1971, 1972, 1973, 1974, and 1975 and took her to inspect the Benton farm two to four times per year during 1974 and 1975. These visits typically lasted 45 minutes to 1 hour. Decedent got out of the car on about one-half of the farm inspection trips but did not walk long distances through the fields. On some occasions between 1969 and 1975, Thomas drove decedent to visit the Warren farm. Brazes also made walking inspections of the farms. It took him 1 to 2 hours to walk the Benton farm and 2 to 4 hours to walk the Warren farm. The Benton farm was leased to the following tenants *353 during 1970 through 1977: Years
Tenants
1970-1973
Lynden Granlund (hereinafter sometimes
referred to as "Granlund")
Oxford, Indiana 47971
1974-1977
Donald Atkinson (hereinafter sometimes
referred to as "Atkinson")
Oxford, Indiana 47971 Granlund farmed the Benton farm from 1940 until he retired in 1973. [7] Granlund farmed the Benton farm under an oral agreement that grain receipts and expenses were to be split 50-50. Granlund provided the labor and machinery. Decedent and Granlund received separate checks from the grain elevators and were billed separately for expenses such as herbicide, grain, and seed. Granlund took decedent out to the Benton farm in the spring and in the fall. Atkinson became the tenant on the Benton farm in 1974 after learning from Granlund that the latter was retiring. Atkinson talked to decedent about becoming her tenant and, when he learned that Brazes was managing the other farm, he suggested that she let Brazes manage both farms. The first time Atkinson met with decedent to discuss becoming her tenant, in the summer of 1973, he had a long discussion with her. After *354 he became her tenant, he telephoned and talk briefly with her to discuss the progress of the crops or other similar matters. Atkinson leased the Benton farm pursuant to an oral lease having terms very similar to the written farm lease with Skoog governing the Warren farm. As was the case with Skoog and Granlund, Atkinson furnished the machinery and equipment that were used in farming the Benton farm. Skoog was selected as the tenant on the Warren farm in 1965 because he knew Brazes, had satisfactorily farmed other farms for Farmcraft, and had the machinery and labor to handle the farm. Skoog paid one-half of the farm expenses and had the other half billed to the farm account. He had two separate checks made out for receipts. He never made a report or accounting to decedent. Decedent's Federal income tax returns for 1974, 1975, and 1976 were prepared by Brazes. These tax returns list decedent's occupation as "retired". Her 1977 tax return was prepared by an attorney in Fowler, Indiana. Decedent's 1974, 1975, and 1976 tax returns showed the farm operations on Schedule F, Farm Income and Expenses, as indicated in table 1. Table 1
1974
1975
1976
Income
Sale of grain
$28,135.21 $29,647.91 $36,418.27 Interest
652.36 680.03 719.75 Patronage dividends
395.07 Gross profit
$28,787.57 $30,723.01 $37,138.02 Deductions
(13,265.80)
(18,060.61)
(16,801.47)
Net farm profit
$15,521.77 $12,662.40 $20,336.55 *355 On each of these tax returns, the "Net farm profit" line (line 54) concluded with the words "ALSO enter on Schedule SE, Part I, line 1(a)". On each of these tax returns, self-employment tax liability was neither reported nor paid on decedent's farm income. The aggregate value of decedent's interests in the two farms when valued for use as farms for farming purposes is $107,825 (the value reported on the estate tax return by the estate, whose election of special use valuation under section 2032A was mechanically proper). [8] The aggregate value of decedent's interests in the two farms when valued without regard to that restriction is $306,000 (the value determined in the notice of deficiency). [9]
OPINION Petitioner contends that during the 8-year period ending on the date of decedent's death, there were periods aggregating 5 years or more (1969, and 1971 through 1975) during which decedent materially participated in the operation of her two farms within the meaning *356 of section 2032A(b)(1)(C)(ii), so as to enable her estate to qualify for the benefits of the special use valuation provisions of section 2032A. Respondent contends that decedent's activities with regard to the operation of her farms did not constitute material participation within the meaning of the statute and the applicable regulations. We agree with respondent. [10]
Section 2032A was enacted by section 2003(a) of the Tax Reform Act of 1976, Pub. L. 94-455, 90 Stat. 1520, 1856. The Congress concluded *357 that, in some cases, the estate tax impeded the continuation of family farms or other family businesses, because the estate had to value -- and pay tax on -- the "speculative value" of the farm or business property, rather than the value based on the use to which this property was being put. [11] *358 The Congress believed that "it is desirable to encourage the continued use of property for farming and other small business purposes." H. Rept. 94-1380 at 22 (1976), 1976-3 C.B. (Vol. 3) 735, 756. In effect, the statute permits taxes on qualifying real property to be computed on an income capitalization method of valuation rather than on the basis of its fair market value and thus limits the taxed value of real property where it continues to be used for the favored family business purpose. Estate of Geiger v. Commissioner,80 T.C. 484, 488 (1983). However, the Congress recognized that it was thereby granting a tax benefit to certain people under certain circumstances that would not be available *359 to the public generally. Accordingly, the Congress hedged about the tax benefit with numerous restrictions including the following: (1) limits on the benefit's amount, (2) the use to which the property was put by decedent or certain related individuals, (3) the manner of electing the tax benefit, and (4) recapture of the tax benefit if the related individuals end their qualifying use. [12] The limitation involved in the instant case is the one provided by section 2032A(b)(1)(C)(ii)[13] *360 *361 *362 which requires that decedent have materially participated in the operation of the farms during periods aggregating at least 5 years out of the 8-year period ending on the date of decedent's death. [14] *363 Section 20.2032A-3, Estate Tax Regs., [15] *364 *365 interprets the material participation requirement of the statute. Although adopted after the date of decedent's death, this regulation is applicable to decedent's estate. Estate of Coon v. Commissioner,81 T.C. 602, 608 (1983); sec. 7805(b). Section 2032A(e)(6) provides that, "Material participation shall be determined in a manner similar to the manner used for purposes of paragraph (1) of section 1402(a) (relating to net earnings from self-employment)". [16] *366 *367 *368 Whether decedent materially participated in the operation of her farms is an issue of fact. Section 20.2032A-3(a), Estate Tax Regs. Petitioner bears the burden of proving error in respondent's determination. Welch v. Helvering,290 U.S. 111 (1933); Rule 142(a), Tax Court Rules of Practice & Procedure. In determining whether decedent materially participated in the operation of the farms, we do not treat the activities of her agents (Farmcraft, Brazes) as the activities of decedent. Sections 2032A(e)(6) and 1402(a)(1); section 20.2032A-3(e)(2), Estate Tax Regs.; section 1.1402(a)-4(b)(5), Income Tax Regs.
The relevant time period began on September 27, 1969, and ended on the date of decedent's death. Petitioner must show that decedent materially participated in the operation of the farms during periods aggregating at least 5 years within this relevant time period. Petitioner contends that this material participation occurred during 1969 and 1971 through 1975. The periods petitioner asks us to *369 focus on aggregate only 5 years 3 months and 3 days. Altogether, petitioner was in Oxford for about 3 years and 3 months during the relevant period, [17] including part or all of six growing seasons (the tag end of 1969, all of 1971 and 1972, most of 1973 and 1974, and all of 1975). We proceed to a consideration of decedent's activities during the relevant period in light of the pertinent regulations. Decedent was not actually employed on either of the farms on a substantially full-time basis; thus we look to the applicable factors set forth in section 20.2032A-3(e)(2), Estate Tax Regs. Subparagraph (2) provides that "the principal factors" *370 are physical work and participation in management decisions. Decedent did not do any of the physical work; she participated to some extent in management decisions. Subparagraph (2) provides that "[a]s a minimum" decedent must "regularly advise or consult with the other managing party on the operation of the business." In 1965, shortly after decedent and Farmcraft signed the farm service contract, she and Brazes discussed and selected the basic manner of operating the farm. The original plan did not change. Brazes sometimes discussed with decedent what seed, herbicide, or fertilizer to buy or when or where to market the crops. Brazes visited decedent about once a month when she was in Oxford (see n.17, supra) to discuss the farm operations. On three occasions, she directed Brazes as to proposals he put before her (see n.6, supra). In 1969, she disagreed with Brazes' recommendation to install drain tiles on the Warren farm; this project was delayed until 1971. The other two occasions related to a hedging transaction and a government farm subsidy program; they apparently occurred at some times during the period 1971 through 1975. Brazes took decedent by car to visit the Warren farm *371 about once a month from May through October and the Benton farm two to four times a year. These visits typically lasted 45 minutes to 1 hour. On about half of these visits, decedent got out of the car, but she did not walk long distances through the fields. During the time that Granlund leased the Benton farm (through 1973), he took decedent out to this farm in the spring and in the fall. Under decedent's contract with Farmcraft, she was obligated to maintain a bank account, accessible to Brazes and John R. Hays, to pay all the expenses of the Warren farm. This arrangement began to apply to the Benton farm in 1974, when decedent and Farmcraft entered into an oral contract as to the latter farm. Before 1974, decedent and Granlund were billed separately for their 50-50 shares of expenses. Petitioner paid her share of the expenses of both of these farms. Throughout the relevant period, all the machinery and implements on both farms were provided by the tenants (Skoog on the Warren farm, and Granlund and Atkinson on the Benton farm). Decedent had lived on the Warren farm until she married, but not for the last 55 years of her life; she never lived on the Benton farm. We have carefully *372 compared the facts of the instant case with those in Estate of Coon v. Commissioner,81 T.C. 602 (1983), in which we held for respondent on this issue, and we conclude that there is no significant difference between the two cases. As was the case with Frank J. Coon in Estate of Coon, decedent did assume financial responsibility for a substantial portion of the expense involved in the operation of both farms; however, she did not provide any of the machinery or implements for either farm and she did not reside on either farm. Decedent did inspect the production activities in the instant case, to a greater extent than did Frank J. Coon in Estate of Coon. On the other hand, decedent's discussions with Brazes, Granlund, Atkinson, and Skoog in the instant case involved less decision-making than did Frank J. Coon in his conversations with tenants and a go-between in Estate of Coon.
Giving appropriate weight to the foregoing factors, we conclude that decedent did not participate materially in the operation of either the Warren farm or the Benton farm (see n.10, supra) within the meaning of section 2032A(b)(1)(C)(ii) and the relevant regulations. Clearly, decedent was attached to both farms. *373 It may well be that she participated as materially as she could, given her impaired health and advanced age. Neither the statute nor the regulations makes provision for these factors. [18] The Congress provided a tax benefit; the Congress chose to hedge this benefit about with numerous, detailed hurdles, failure to satisfy any one of which precludes the benefit; we see no basis for bending the rules of the statute or the regulations (see n.12, supra). Finally, we note that the Congress tied the material participation requirements into standards similar to those applicable to the self-employment tax. Although decedent's estate now claims that decedent materially participated in the farm operations in 1974 and 1975, and although petitioner reported net farm profit of $15,521.77 for 1974 and $12,662.40 *374 for 1975, decedent did not pay self-employment tax for either of these years. We hold for respondent. To take account of respondent's concession as to additional administrative costs, Decision will be entered under Rule 155.
Footnotes
1. Unless indicated otherwise, all section references are to sections of the Internal Revenue Code of 1954 as in effect for the date of decedent's death.↩
2. Thomas Coffing, Sr., was a funeral director and owned and managed a funeral home.↩
3. Thomas had secured employment in Indianapolis, Indiana, to begin about that time. Thomas moved his family to Indiana. They stayed with decedent in Oxford until August 1973, when they moved to their own home in Indianapolis. ↩
4. From about 1972 to 1975 decedent used a walker. After 1975 there were times when she was confined to a wheel chair. During much of this period, however, she could move short distances around her house without a cane or a walker. Throughout the relevant period when she was in Oxford, decedent resided alone in her home and led a normal life. She cooked her meals and did her own housework. A woman came in approximately once a week to do heavy cleaning tasks.
5. Decedent introduced Brazes to his future wife.↩
*. Owners share of cost of purchased livestock, feed grains, and hay is deducted in annual fee calculation. [Underscored items typed onto printed contract.]↩
6. In 1969, Brazes recommended to decedent that she install drain tiles on the Warren farm. Decedent disagreed and decided to delay this project until 1971. Decedent also on one occasion told Brazes not to enter into a hedging transaction for a while, and on another occasion decided not to participate in a government farm subsidy program.
7. Granlund worked for Thomas Coffing, Sr., in the funeral home business until the latter's death in 1938.↩
8. The estate tax return shows the Benton farm at $44,100 and decedent's interest in the Warren farm at $63,725. ↩
9. The notice of deficiency shows the Benton farm at $132,000 and decedent's interest in the Warren farm at $174,000.↩
10. Petitioner's analysis is based on separate consideration of the Warren farm and the Benton farm. Respondent appears to treat the two farms as a single operation for purposes of the instant case. Since our conclusion is the same whether we treat the two farms together or separately, we do not decide in the instant case whether the two should be aggregated. Compare Estate of Geiger v. Commissioner,80 T.C. 484, 487 (1983), which reserved the question, with Estate of Coon v. Commissioner,81 T.C. 602 (1983), in which the matter is not discussed. See also the conflicting analyses in the opinions in Estate of Sherrod v. Commissioner,82 T.C. 523 (1984), revd. 774 F.2d 1057↩ (CA11 1985).
11. The report of the Committee on Ways and Means (H. Rept. 94-1380 at 22 (1976), 1976-3 C.B. (Vol. 3) 735, 756) describes the perceived valuation problems that the new section was designed to change as follows: Valuation on the basis of highest and best use, rather than actual use, may result in the imposition of substantially higher estate taxes. In some cases, the greater estate tax burden makes continuation of farming, or the closely held business activities, not feasible because the income potential from these activities is insufficient to service extended tax payments or loans obtained to pay the tax. Thus, the heirs may be forced to sell the land for development purposes. Also, where the valuation of land reflects speculation to such a degree that the price of the land does not bear a reasonable relationship to its earning capacity, your committee believes it unreasonable to require that this "speculative value" be included in an estate with respect to land devoted to farming or closely held businesses. This Ways and Means Committee report is properly part of the legislative history of the Tax Reform Act of 1976 (even though it is a report on a different bill), having been approved by the conferees on the 1976 Act. S. Rept. 94-1236, H. Rept. 94-1515 (Conf. Rept.) at 610 (1976), 1976-3 C.B. (Vol. 3) 808, 960. See Estate of Sachs v. Commissioner,88 T.C. 769, 772↩ n.2 (1987).
12. As the Court of Appeals put it in Martin v. Commissioner,783 F.2d 81, 94 (CA7 1986), affg. 84 T.C. 620↩ (1985), special use valuation is an "exceptionally favorable tax treatment that the statute provides to those who come within its demanding terms". 13. Section 2032A provides, in relevant part, as follows: SEC. 2032A. VALUATION OF CERTAIN FARM, ETC., REAL PROPERTY. * * * (b) Qualified Real Property -- (1) In general. -- For purposes of this section, the term "qualified real property" means real property located in the United States, which was acquired from or passed from the decedent to a qualified heir of the decedent and which, on the date of the decedent's death, was being used for a qualified use by the decedent or a member of the decedent's family, but only if -- * * * (C) during the 8-year period ending on the date of the decedent's death there have been periods aggregating 5 years or more during which -- * * * (ii) there was material participation by the decedent or a member of the decedent's family in the operation of the farm or other business, * * * (e) Definitions; Special Rules. -- For purposes of this section -- * * * (6) Material participation. -- Material participation shall be determined in a manner similar to the manner used for purposes of paragraph (1) of section 1402(a) (relating to net earnings from self-employment). [Sec. 2032A(b)(1) was retroactively amended in 1978 by sec. 702(d)(1) of Pub. L. 95-600, 92 Stat. 2928, for estates of decedents dying after December 31, 1976, by adding the phrase "which was acquired from or passed to a qualified heir of the decedent and", after "real property located in the United States". Sec. 2032A(b)(1) was again amended in 1981 by inserting "by the decedent or a member of the decedent's family" after "qualified use" each place it appears (sec. 421(b)(1) of Pub. L. 97-34, 95 Stat. 306). The latter amendment was also retroactive with respect to estates of decedents dying after December 31, 1976, by sec. 104(b)(4) of Pub. L. 97-448, 96 Stat. 2382.] Section 1402(a)(1) provides as follows: SEC. 1402. DEFINITIONS. (a) Net Earnings From Self-employment. -- The term "net earnings from self-employment" means the gross income derived by an individual from any trade or business carried on by such individual, less the deductions allowed by this subtitle which are attributable to such trade or business, plus his distributive share (whether or not distributed) of income or loss described in section 702(a)(8) from any trade or business carried on by a partnership of which he is a member; except that in computing such gross income and deductions and such distributive share of partnership ordinary income or loss -- (1) there shall be excluded rentals from real estate and from personal property leased with the real estate (including such rentals paid in crop shares) together with the deductions attributable thereto, unless such rentals are received in the course of a trade or business as a real estate dealer; except that the preceding provisions of this paragraph shall not apply to any income derived by the owner or tenant of land if (A) such income is derived under an arrangement, between the owner or tenant and another individual, which provides that such other individual shall produce agricultural or horticultural commodities (including livestock, bees, poultry, and fur-bearing animals and wildlife) on such land, and that there shall be material participation by the owner or tenant (as determined without regard to any activities of an agent of such owner or tenant) in the production or the management of the production of such agricultural or horticultural commodities, and (B) there is material participation by the owner or tenant (as determined without regard to any activities of an agent of such owner or tenant) with respect to any such agricultural or horticultural commodity. 14. Petitioner does not contend that Thomas or any other "member of the decedent's family" (sec. 2032A(b)(1)(C)(ii)) materially participated in the operation of the farms. Respondent concedes that the election of the claimed benefit was mechanically proper and that petitioner would qualify for the benefit but for the material participation requirement.
15. Section 20.2032A-3, Estate Tax Regs., provides in pertinent part as follows: Sec. 20.2032A-3. Material participation requirements for valuation of certain farm and closely-held business real property. (a) In general. * * * Whether the required material participation occurs is a factual determination, and the types of activities and financial risks which will support such a finding will vary with the mode of ownership of both the property itself and of any business in which it is used. * * * * * * (e) Required activities -- (1) In general. Actual employment of the decedent (or a member of the decedent's family) on a substantially full-time basis (35 hours a week or more) or to any lesser extent necessary personally to manage fully the farm or business in which the real property to be valued under section 2032A is used constitutes material participation. * * * In the absence of this direct involvement in the farm or other business, the activities of either the decedent or family members must meet the standards prescribed in this paragraph and those prescribed in the regulations issued under section 1402(a)(1). * * * (2) Factors considered. No single factor is determinative of the presence of material participation, but physical work and participation in management decisions are the principal factors to be considered. As a minimum, the decedent and/or a family member must regularly advise or consult with the other managing party on the operation of the business. While they need not make all final management decisions alone, the decedent and/or family members must participate in making a substantial number of these decisions. Additionally, production activities on the land should be inspected regularly by the family participant, and funds should be advanced and financial responsibility assumed for a substantial portion of the expense involved in the operation of the farm or other business in which the real property is used. In the case of a farm, the furnishing by the owner or other family members of a substantial portion of the machinery, implements, and livestock used in the production activities is an important factor to consider in finding material participation. With farms, hotels, or apartment buildings, the operation of which qualifies as a trade or business, the participating decedent or heir's maintaining his or her principal place of residence on the premises is a factor to consider in determining whether the overall participation is material. Retention of a professional farm manager will not by itself prevent satisfaction of the material participation requirement by the decedent and family members. However, the decedent and/or a family member must personally materially participate under the terms of arrangement with the professional farm manager to satisfy this requirement. 16. Section 1.1402(a)-4, Income Tax Regs, provides in relevant part as follows: Sec. 1.1402(a)-4. Rentals from real estate. * * * (b) Special rule for "includible farm rental income" -- (1) In general. Notwithstanding the rules set forth in paragraph (a) of this section, there shall be included in determining net earnings from self-employment for taxable years ending after 1955 any income derived by an owner or tenant of land, if the following requirements are met with respect to such income: (i) The income is derived under an arrangement between the owner or tenant of land and another person which provides that such other person shall produce agricultural or horticultural commodities on such land, and that there shall be material participation by the owner or tenant in the production or the management of the production of such agricultural or horticultural commodities; and (ii) There is a material participation by the owner or tenant with respect to any such agricultural or horticultural commodity. Income so derived shall be referred to in this section as "includible farm rental income". * * * (4) Actual participation. In order for the rental income received by the owner or tenant of land to be treated as includible farm rental income, not only must it be derived pursuant to the arrangement described in subparagraph (1) of this paragraph, but also the owner or tenant must actually participate to a material degree in the production or in the management of the production of any of the commodities required to be produced under the arrangement, or he must actually participate in both the production and the management of the production to an extent that his participation in the one when combined with his participation in the other will be considered participation to a material degree. If the owner or tenant shows that he periodically advises or consults with the other person, who under the arrangement produces the agricultural or horticultural commodities, as to the production of any of these commodities and also shows that he periodically inspects the production activities on the land, he will have presented strong evidence of the existence of the degree of participation contemplated by section 1402(a)(1). If, in addition to the foregoing, the owner or tenant shows that he furnishes a substantial portion of the machinery, implements, and livestock used in the production of the commodities or that he furnishes or advances funds, or assumes financial responsibility for a substantial part of the expense involved in the production of the commodities, he will have established the existence of the degree of participation contemplated by section 1402(a)(1)↩ and this paragraph.
17. Decedent left Oxford in December 1969, and did not return until April 1971. She visited Thomas in Texas City from November 1971 to early 1972. She spent the last few months of 1972, first in a hospital, then in a nursing home, and then visiting Thomas in Texas City. She returned to Oxford about May 1973. She visited Thomas in Indianapolis from December 1973 to April 1974, and from November 1974 to April 1975. She was hospitalized in July 1974 and again in November 1975. She did not return to Oxford after her November 1975 hospitalization.↩
18. We note that the statute requires material participation for only 5 years out of the 8 years ending at decedent's death. It may be that this provision was intended to take account of ill health or unavoidable absence. Also, the statute permits the requirement to be satisfied by a family member. This provision, too, would provide relief where the decedent was ill or unavoidably absent.↩